Merrimack, No. 4019.
July 27, 1951. No. 4020.

STATE *v.* STEPHEN B. STORY.

STATE *v.* DONAT F. COTE.

*Gordon M. Tiffany, William L. Phinney, Ernest R. D'Amours,* Attorneys General, *Raymond K. Perkins,* County Solicitor, and *McLane, Davis, Carleton & Graf, Arthur A. Greene, Jr.,* and *Stanley M. Brown* (*Messrs. Graf* and *Brown* orally), for the State.

*Ernest L. Bell, Jr., James S. Davis* and *Elwin L. Page* (*Messrs. Bell* and *Davis* orally), for Stephen B. Story.

146

*Alvin A. Lucier, Normand R. Pelletier* and *Elwin L. Page (Mr. Lucier* orally), for Donat F. Cote.

LAMPRON, J. The indictments in our opinion are valid under our law. Hence there is no necessity to pass on the seasonableness of the motions to quash. *State* v. *Langelier,* 95 N. H. 97, 99.

Article 15th of the Bill of Rights of the Constitution of New Hampshire provides: "No subject shall be held to answer for any crime, or offense, until the same is fully and plainly, substantially and formally, described to him; . . ." Under our decisions this requirement of our Constitution is met if the indictment informs the respondent of the nature and cause of the accusation with sufficient definiteness so that he can prepare for trial. *State* v. *Rousten,* 84 N. H. 140, 143; *State* v. *Langelier, supra; State* v. *Ellard,* 95 N. H. 217, 220.

The respondents argue that the indictments against them do not meet these requisites and are therefore defective and should have been quashed. *State* v. *Gilbert,* 89 N. H. 134; *State* v. *Liptzer,* 90 N. H. 395. Their position is substantially that the indictments consist of statements of legal conclusions instead of being definite factual descriptions of the nature and cause of the accusations made against them. *State* v. *Piper,* 73 N. H. 226, 229. Their chief defects, they contend, are (1) no definition of actual cost which must necessarily have been the basis from which overcharges could be found, (2) no identification of the items on which overcharges are claimed, (3) no specification of the amount of any overcharge.

However desirable it might seem to an accused that the State should be compelled to set out in an indictment the details of the evidence on which it relies to sustain the charges made, respondents are not entitled by law to that information. *State* v. *Ellard, supra.* The true test is not whether the indictment could possibly be made more definite and certain but rather whether it alleges every element of the offense charged in language sufficiently definite to apprise the respondents of what they must be prepared to meet for trial. 27 Am. Jur. 625; see *State* v. *Canatella,* 96 N. H. 202. It also stands to reason that the circumstances surrounding the particular offense may of necessity affect the degree of definiteness which can be reasonably required of the State in its indictment. *State* v. *Burke,* 54 N. H. 92, 94; *State* v. *Canatella, supra,* 204.

Although not decisive of the question it is fair to say that Cote does not seriously contend that the indictments against him do not

allege all of the elements of the statutory offense (R. L., *c.* 450, *s.* 1) with which he is charged. His main contention is that these allegations are not made in the manner required by our Constitution. (Const., Pt. I, Art. 15). *State* v. *Piper, supra.*

All of the counts in the indictments arising out of payments received for work done at the Liquor Warehouse and at Plymouth are based on the presentation of invoices for work done and materials furnished under the terms of the so-called "A B C" contract existing between the parties. (The Laconia indictments are based on a special contract for that work). This "A B C " agreement, arrived at by the two respondents at a meeting between them prior to any of the work involved being undertaken, was reduced to writing in a letter dated December 13, 1946, from Story to Standard Construction Company, one of the trade names under which Cote conducted his business. It read as follows:

"This is authority for you to perform work of alterations and repairs at the Liquor Warehouse, Concord, New Hampshire, as ordered and directed.

"The basis of compensation will be as follows:

Item A. Labor and materials, trucking and transportation at actual cost.

Item B. Supervision, planning, insurance and taxes computed at 10% of Item A.

Item C. Profit computed at 15% of Item A and Item B.

"Special items of equipment will be at prices agreed upon separately.

"Invoices and accounts will be available for our checking and inspection."

We consider now respondents' contention that the indictments are defective for lack of definition of actual cost. The basis on which Cote was to be paid for work done, which the State maintains was disregarded and thereby constituted the obtaining of money from the State by false pretenses with intent to cheat and defraud, is set out in the indictments in almost the identical language contained in the written agreement between the parties under the terms of which some $600,000 of State work was undertaken at various times during the period in question. It seems plain that the material fact which the State alleges was misrepresented, i. e. actual cost, was set out in the various indictments with the definiteness required by our law. It may also be noted that there is no suggestion in the record that this particular argument was advanced in the Trial Court.

The other defects in the indictments of which the respondents complain are the absence of identification of the specific items on which overcharges are claimed and lack of specification of the amounts of overcharges. Each count in every indictment is based on a specific invoice presented to the State on a particular day and the payment received therefor. Each count informed the respondents that the total claimed in that particular invoice under Item A (according to the "A B C" agreement) as being the actual cost of labor, and materials, trucking and transportation furnished was falsely represented to be in excess of what it really was. That is the specific. false representation alleged to have been made in a particular instance on a day certain with intent to cheat and defraud. How the State would prove this charge was a matter of evidence the details of which need not be contained in the indictment. *State* v. *Ellard*, 95 N. H. 217, 220. It is also easily understandable that in a situation such as this, involving thousands of items covered by almost as many different invoices from various suppliers, the State might not have the information required to determine the exact amount of the false pretenses and of necessity be unable to declare it in the indictments. However the gist of the offense is the false representation. The extent of the overcharge resulting from the misrepresentation is not essential to the determination of the fact that a crime was committed, nor does it determine the class of the crime (as in larceny). The exact amount of the misrepresentation being unknown to the State and that fact stated in the indictment, its omission was not such a defect as would require that the indictments be quashed. *State* v. *Burke*, 54 N. H. 92, 94, 95; *State* v. *Canatella*, 96 N. H. 202, 204.

The respondents make the further argument that while the indictments at the Liquor Warehouse and at Plymouth charged that Cote on invoices falsely represented actual cost of items and services furnished the State, the proof was that the misrepresentations consisted (1) in overstating the actual cost of materials used on those jobs, (2) overstating the actual cost of labor used there, (3) overstating the quantity of labor and material used, (4) submitting invoices for materials and supplies not furnished, (5) submitting invoices charging for labor, material and equipment furnished or used on separate agreed price work for which payment was separately received, (6) submitting to the State for materials purchased from it invoices at prices substantially in excess of actual cost.

This argument, in our opinion, is not essentially a reason for

quashing the indictments, but rather presents the problem of whether or not there was a material variance between the allegations in the indictments and the proof offered in support of them. In other words was the offense proved different from the offense charged. 42 C. J. S. 1273; 2 Wharton's, Criminal Evidence (11th ed.) 1841. Taking the same count 1 in the Liquor Warehouse indictment and analyzing its allegations we find that it alleges that Cote was to be paid the actual cost of goods and services furnished to the State; that in presenting this invoice he pretended that the actual cost of the goods and services furnished was a certain amount; that in truth and in fact their actual cost was not the amount represented but a sum less. In other words Cote is charged with having misrepresented (a) that all the items listed on the invoice presented were furnished to the State, under the "A B C" agreement, (b) that the cost figures assigned to them were their actual cost. The evidence offered by the State under the six headings above referred to was material as tending to prove these misrepresentations. Being matters of evidence the State was not required to allege them in the indictments. *State* v. *Ellard* 95 N. H. 217, 220; *State* v. *Twarog*, 97 N. H. 101.

We have examined all of the arguments advanced by both respondents by brief and orally in support of their motions to quash the indictments and find that the indictments are valid under our law. The exceptions to the denial of these motions are therefore overruled.

We will consider next whether or not, on the evidence, the respondents were properly convicted of the offenses with which they were charged.

Against Cote the State had the burden of proving beyond a reasonable doubt as to each count all of the following elements: (1) an intent to defraud, (2) a false pretense, in this case a false representation of facts, (3) the wrongful obtaining of the moneys of the State of New Hampshire, (4) the false pretense was the cause of the transfer of the money from the State to Cote in the sense that operating either alone or with other causes it had such a controlling influence that the moneys of the State would not otherwise have been paid over to the respondent. *State* v. *King*, 67 N. H. 219; *State* v. *Skaff*, 94 N. H. 402, 404.

Against Story the State had the burden of proving beyond a reasonable doubt as to each count all of the following elements: (1) that Cote was guilty of wrongfully obtaining money of the State

by false pretense, with intent to cheat and defraud, a felony, (2) that Story had a criminal intent and knew that Cote had the intent to defraud the State in that manner, (3) that he procured, aided or counselled the commission of the felony committed by Cote knowing that such offense was to be committed but was not present either actively or constructively when the felony was committed (R. L., c. 459, s. 1; 1 Burdick, Law of Crime 298), or that he received, relieved, comforted or aided Cote with knowledge that the latter had committed the felony with which he is charged. R. L., c. 459, s. 2; 1 Burdick, *supra*, 301.

The respondents do not question the fact that all of the moneys of the State of New Hampshire which Cote is alleged to have received in the various counts of the different indictments were received by him. Nor do they question the adequacy of the proof by the State that but for the presenting by Cote of the invoices set out in the indictments these moneys would not have been paid to him. The elements in issue therefore as to Cote are whether the State proved beyond a reasonable doubt that the invoices presented by Cote were false representations of facts and that they were presented by him with intent to defraud the State thereby wrongfully obtaining the State's money.

What can properly be termed the pivotal issue in the case is the meaning of the words "actual cost" under Item A of the "A B C" agreement.

The State contended that actual cost means, as to materials, the invoice price of suppliers to Standard, as to labor, the wages paid by Standard to its workmen, as to subcontracts, the cost to Standard for such work, that is, what Standard paid the subcontractors.

The respondents' position as to actual cost called for the application of various formulas. As to materials Cote testified that the State was to be charged the same "selling cost" as that charged to all of Standard's customers. This cost was arrived at by adding 10% to the vendor's price to Standard on items which Standard carried on its price book (a Wheeldex with cards for different items). As to plumbing and heating items the "selling cost" was determined by using the Bradford book, a trade book. As to electrical items it was determined by using another trade book, the Henderson book. There was also evidence that any extra costs directly attributable to certain items such as expediters' expenses or black market pricing, transportation, freight and express charges were also added to

make up the cost at which the State was billed. Story testified that when discussing with Cote the arrangements under which the work was to be done "I said to Mr. Cote, the cost of acquiring materials getting them to the job and having them ready for use or for incorporation into the work should be based upon what as near as possible we could arrive at as the facts. Mr. Cote said that he had applied as a custom ten percent to the vendor's cost to cover that particular item. We also discussed that if additional or unusual costs should come into the supplying of items or materials that this additional cost should be applied, and that as a measure of what actual cost should be as to that, if he took material out of his warehouse or out of stock, what he had to pay to put the material back represented actual cost. . . ."

As to labor both respondents testified that actual cost was to be the prevailing rate for the particular craft, which was the union rate. Schoppe "an assigned accountant" of Standard testified that in every instance the charge for labor to the State was in excess of the amount that the corporation paid for labor of the men.

As to subcontracts both respondents testified that the charge to the State under Item A as actual cost was to be what Standard paid the subcontractor plus 10%. The reason being that the State would not deal directly with any subcontractor but it would look to Standard for the planning and the quality and permanence of their work.

The Trial Court took the position that "actual cost" has no definite meaning in law, that its meaning varies in different situations, and permitted evidence to be introduced to aid in determining the meaning of the parties in the use of those words in the agreement. He submitted to the jury the question of determining "based on all the evidence, what the parties meant those words to convey in that contract, what those words are supposed to imply."

Neither side introduced any evidence directly defining actual cost unless it is the testimony of the accountant Schoppe that based upon his experience as an accountant and auditor for Standard there was an intended ten percent increase to convert from acquisition to actual cost or selling cost. Each side's evidence tended to prove the meaning of these words to be in accordance with their respective contentions previously set forth.

Counsel for both Cote and Story took the position at the trial that their clients who entered into the "A B C" agreement could "tell what the final negotiations were, when they took place and

what was said, and it is up to the jury to interpret the contract and finally pass on the meaning of what was said and was done . . . ." The Trial Court ruled that he would permit the introduction of the conversations between Cote and Story which led up to the agreement but that he would not "permit either one to define what they think actual cost means." Cote requested the Court to charge "8. There is no legal definition of actual cost. Actual cost is what the contracting parties understood it to be." The Court gave the first part of this request in substance in his charge and Story took no exception to that portion of the charge nor did he except to the Court's failure to give his request "16. 'Actual cost' in this case is the cost to Standard of the goods or service delivered upon the site of the work ready for use or incorporation into the work."

It is now argued in this court that it is the function and duty of the Trial Court, and not of the jury, to determine the meaning of actual cost in this written agreement. *Brampton Woolen Co.* v. *Local Union,* 95 N. H. 255. However the question was submitted to the jury at the respondents' request as obviously they then considered this procedure to their advantage. The State therefore correctly argues that they cannot now complain that the issue was left to the jury. *Langdon* v. *Interstate Bridge,* 92 N. H. 432, 434. *Perreault* v. *Company,* 87 N. H. 306, 308; *Kusky* v. *Laderbush,* 96 N. H. 286.

In our opinion the jury could properly find on the evidence that actual cost meant what the State contended, viz; the price that Cote doing business as Standard and otherwise paid his employees, suppliers and subcontractors for labor and materials. *State* v. *N. W. Poultry & Egg Co.,* 203 Minn. 438, 443; *Mailander* v. *Bank,* 11 S. W. (2d.) 615, 617. The language of the "A B C" contract itself was strong evidence in favor of this interpretation. Item A was to be billed at actual cost: Items B and C were to be *computed* at 10% and 15%. The absence of the word computed in Item A would seem to negative the contention of respondents that actual cost was to be arrived at by adding 10% to invoice cost or by using certain trade books which computed what was the "selling cost" of an article. The jury was not compelled to accept the version of respondents as to the meaning of this agreement. *State* v. *Del Bianco,* 96 N. H. 436, 438. And in adopting the State's contention instead of that of the respondents they could take into consideration the failure of the latter to produce any documentary evidence to support their contention. A schedule of rates to be

charged for equipment was stated to have been used at Cote's place of business and Story supposedly had a copy of it. No such schedule was produced. Wheeldex cards supposedly were used to establish prices of some items. No such cards were produced, although the bare Wheeldex was introduced. No list of prevailing rates of labor; no detail of the hours of labor involved was produced. None of the Bradford or Henderson book pages were produced. They were either lost, mislaid or destroyed.

As to most of the thirty counts in the indictment against Cote pertaining to payments received for work at the Liquor Warehouse and the thirteen counts in the indictment against him pertaining to payments for work at Plymouth, the State submitted evidence that the cost of at least one item on each of the invoices (one of which was the basis of each count) as represented was in excess of its actual cost to Standard on the State's theory of actual cost, either because of misrepresentation of cost or quantity or both, or by reason of invoicing items which had already been paid for on other contracts. As to the remaining counts, the jury could find from all the evidence, including the respondents' own evidence as to what constituted "actual cost," that the invoices paid by the State covered charges which were more than actual cost under the State's contention.

Much of this evidence consisted in comparing what Standard had paid suppliers for certain items and what Standard charged the State under Item A for similar items at about the same time. Examples are; plywood paid 15 cents per square foot charged 40 cents; 2 Lewis-Shepard Jacklift trucks and equipment paid $2,984., charged $3,282.40, plus $492.36 handling charge; 2 Lewis-Shepard Jacklift trucks complete paid $3,004 charged $4,562.40; industrial vacuum cleaner paid $350.55, charged $625. The State advanced $4,500 for "1 used elevator complete" and was billed in addition under Item A $4,724.68 for parts for an elevator, there being only one elevator involved. Philip T. Carey Co., subcontractor was paid by Standard $2,230.15, the State was charged $2,453.17; A. W. Therrien Co., subcontractor was paid $6,591.46, the State was charged $7,250.46. All labor of Standard on all of the Liquor Warehouse and Plymouth work was charged to the State at more than what the corporation paid the men.

The two counts against Cote in the Laconia indictment are not based upon the "A B C" agreement but upon an entirely different contractual situation arising out of a specific agreed price contract

for the installation of a sprinkler system by Vulcan Fire Protection Corporation for $30,000. They charge that payments were obtained before due by false pretenses. The specifications upon which this contract was accepted on November 3, 1947, contained the following provision; "Requisitions for payments shall be marked 'Materials and Labor' and shall be due upon proof that the materials and or Labor has been delivered to the premises, or is being held in our warehouse or fabrication plant, waiting processing."

The next day on November 4, an invoice was presented by Cote and approved by Story for payment of $13,000 on this contract, and paid on November 10. Under date of December 26, 1947, a second invoice was processed and $5,000 more received by Cote on December 30. The State submitted evidence as follows: the work of installing the system at Laconia did not start before January of 1948; on November 10, Vulcan had not supplied any materials to the job site nor did it have at the warehouse or fabrication plant materials whose cost or value was anywhere near $13,000; on December 30, Vulcan did not have installed or on hand $18,000 worth of materials and labor on this contract but at most about $9,000.

To prove that the misrepresentations were fraudulently made by Cote with knowledge of their falsity for the purpose of defrauding the State there was the following evidence.

With reference to the Laconia indictments it appeared that Cote was then president of Vulcan, controlled the corporation and personally directed the preparation of the two invoices involved. After Vulcan had received these two payments totalling $18,000 on a $30,000 contract, he personally signed a statement which indicated that the job was only 5% complete. At about the same time on another job involving an invoice of some $4,600, in spite of the objection by one of the subordinates of Vulcan that it had done no work and was not entitled to collect money from the State, Cote said "he was going to put it through." He personally directed the disposition of an $8,000 Vulcan check on the Plymouth job for which Vulcan did no work and furnished no materials unless it was piping which cost less than $1,000 and which was unsuited for the work and returned to the vendor.

As to the Liquor Warehouse and Plymouth indictments the State's evidence was that Cote, who admitted that he was "the acting head and operating head" of Standard personally negotiated the basic "A B C" contract with Story. Admitting his complete familiarity with the method of billing used by the Standard group which he

headed, he instructed his chief bookkeeper how to bill the State on this contract and she followed his instructions. The office force looked to him for supervision and orders and employees reported directly to him regarding purchases. He personally hired the pricing clerks and knew the pricing system being used. He checked bills of subcontractors and personally directed the amount to be paid for those services. These subcontractors' bills were charged to the State under Item A at a price higher than what was paid by Standard. Cote personally took the greater part, if not all, the invoices involved to Concord and presented them for payment and personally delivered the checks received to his bookkeeper making note of these payments on a copy of the particular invoice which he had in his possession.

The specific acts with which Story was charged were his written approval either before or after payment of these allegedly fraudulent invoices (except for one with which he is not charged) presented by Cote for payment.

To show that Story had a criminal intent in so doing and that he knew that Cote intended to defraud the State in that manner, there was the following evidence. He, Story, a well educated engineer, an experienced and competent construction supervisor, a man of sound judgment personally supervised the actual construction jobs involved and visited them frequently to keep advised of what was being done. Nevertheless he approved the payment of $4,500 to Cote on January 2, 1947, for "1 used elevator complete." He thereafter learned that the elevator for which this money had been advanced would not be supplied but did not require that Cote repay the State. On the contrary he approved in subsequent "A B C" invoices payment of items clearly stated to be for the elevator actually supplied. He arranged for the State to purchase from Standard 5,000 feet of millweight "odd flooring" for $2,000 for which it had paid $1,375. Similarly through Story a carload of "Foamglass" which cost Cote $2,756, was purchased by the State for $4,000, because Story said he expected it might be used at some time, although plans did not then exist, to insulate the roof of some offices which were later eliminated from the addition to the Liquor Warehouse. Although both of these items were purchased in January of 1947 neither the flooring nor the "Foamglass" had been used at the time of the trial more than two years later. These, the State charged, were "white elephants" bought to rid Cote of them and could have been purchased directly from Standard's suppliers at the prices paid

by Standard. There was also evidence that most of the equipment such as the Lewis-Shepard Jacklift trucks and certain laundry equipment, which the State could have bought directly from the suppliers at approximately the price paid by Standard, were purchased from Standard by Story under the "A B C" agreement thus increasing the price to the State by at least 26.5%.

Also Story personally ordered some reinforced concrete pipe for Cote for a job Standard was performing at the Industrial School under a cost plus "A B C" contract. Twice thereafter pipe orders were placed by the Comptroller's office. The State does not sell this pipe to private concerns because it is manufactured by the State Prison hence it was billed to the Industrial School. Yet Standard paid the State for the pipe and billed it back to the State under Item A at an increase of $144.07 over what it paid. As a result of Story's approval of these billings, the State paid Standard $1,482.59 for concrete pipe it had manufactured, which it had delivered for use at its Industrial School and for which Standard paid the State only $1,028.94. He approved the $13,000 payments on the Laconia sprinkler job before they were due. He was in Standard's office in Manchester where he examined their invoices and prices being charged to the State and where he inquired and was advised concerning the method of billing the State on these jobs. Most of the invoices were presented to him personally and he personally supervised and visited the jobs being done thus placing him in a position to compare the invoices with the work done.

As also tending to prove an intent on the part of Cote to defraud the State and an intent to aid and assist him by Story, there was the additional evidence that Story gave Cote these State jobs without competitive bidding, although the law required it in certain instances, and that he permitted appropriations to be overrun on this work. Although Standard's chief bookkeeper denied that Story was a customer of Standard and had an account with the firm, Story's automobile bill, Story hotel bills, hardware store items, tinsmith's bills and other items all were paid by Standard with notations "charge to Story" but no Story account was among Standard's records and Story was in fact never charged with the items. At the trial Cote asserted he had paid Story $1,100 in cash for a Packard beachwagon on which Cote had paid repair bills and had previously stated publicly that Story gave him for having assisted him when his Newbury home was threatened by a forest fire. Cote produced a receipt for this payment dated January 10, 1948, and was positive

the $1,100 had been paid to Story on that date. Story confirmed this testimony about the date of payment and stated that he used this cash thereafter to pay for a new Packard purchased from a Manchester garage. The bookkeeper for the latter produced records in rebuttal showing that Story paid it $1,350 in cash on January 6, 1948, five days prior to the purported receipt.

There was further evidence that when Cote received State checks, he almost invariably had one check "split" and cashed part of the check at the State Treasury. During the fourteen months ending March 1, 1948, $82,000 in cash was thus received by Cote at the State House. A good part of this amount was not recorded on Standard's books as cash received but was reflected on the books by various adjustments such as the transferring of some $46,000 directly from accounts receivable from the State to accounts payable from officers. The books also showed a credit of $2,000 "Commission paid by and charged to D. F. Cote personally for leads to jobs."

Story also admitted that the State had been billed and Standard paid for work which had been done and should have been paid for by the Wilson Co. an adjacent property owner to the Liquor Warehouse. He also admitted the foundation wall (a $20,000 agreed price contract with Standard) and the excavation, (a $13,000 agreed price contract also with Standard) both at the Liquor Warehouse, were also billed and paid for by the State under the "A B C" agreement. He intended to require Cote to adjust all these matters but did nothing about them because "the bell rung and I was sent home." (April 9, 1948). However in his 155 page report made to the Governor and Council on April 6, 1948, on these projects he made no mention of the need for any adjustment. He did not speak of it in his oral testimony before this same body on April 9, nor did he leave any memorandum or other document to that effect in the Comptroller's office when he left.

On the evidence as a whole (*State* v. *Barry*, 93 N. H. 10), the jury could conclude properly and beyond reasonable doubt (*State* v. *George*, 93 N. H. 408, 415) that there was excessive invoicing on each count of the Liquor Warehouse and Plymouth indictments deliberately made by Cote and that there was knowing approval of the same by Story; and that on all counts of every indictment against him, Cote wrongfully obtained money of the State of New Hampshire by false pretense with intent to cheat and defraud, and that Story was guilty as an accessory thereto on all counts in the

indictments against him because he aided and protected Cote in those transactions with a fraudulent intent. *State* v. *Gobin*, 96 N. H. 220, 222; *State* v. *Del Bianco*, 96 N. H. 436, 438. Respondents' motions to dismiss the various indictments were therefore properly denied and their exceptions thereto are overruled.

Their motions to strike evidence pertaining to various transactions with the State other than those covered by the indictments were also properly denied. This evidence related to situations comparable to those on which the indictments were laid and was introduced for the limited purpose of proving their intent to defraud in the indictments being tried and was competent for the purpose to which its use was limited. *State* v. *Skaff*, 94 N. H. 402, 405; *State* v. *Ellard*, 95 N. H. 217, 221.

Among the numerous exceptions to the admission and exclusion of evidence taken by the respondents during the long trial was an exception to the exclusion from evidence of a report prepared for and submitted to the Governor and Council on April 6, 1948, by Story, while Comptroller of the State, covering the work done under his direction by the Standard Construction Company and its affiliated companies. This report, which was never made public, was used by State's counsel for the purpose of impeaching Story in cross-examination. It was excluded from evidence when offered first by Story and later by Cote. This was proper. It was an extrajudicial statement made by Story, after the situation revealed in this case had become a matter of public inquiry, for the purpose of explaining and justifying his actions. Moreover, it did not comply with the requirements of expediency and circumstantial probability of trustworthiness which are the bases of the admission of public documents as an exception to the hearsay rule. *Howson* v. *Company*, 87 N. H. 200, 210; 5 Wig. Ev. (3d *ed*), 513.

Another exception argued at some length by the respondents is the exclusion of their offer to show the net and gross profits of Standard immediately before and during the period involved in the indictments. They maintain this was admissible evidence primarily on the question of their criminal intent because the State's evidence as to alleged over-charges in Item A to which were added items B and C tended to convey the impression that inordinate profits resulted. Evidence was offered, but excluded, to show that Standard's profits were not of such a nature. It is true that evidence that costs were fraudulently increased in "A B C" billing might support an argument that, all else remaining constant, Standard's profits were

increased. However the actual profit of the recipient company has no necessary connection with whether or not the fraudulent misrepresentations took place. Furthermore if this evidence were to be admitted it would inevitably produce a prolonged inquiry into the operations of Standard for at least fifteen months which involves about $1,000,000 of gross business both for the State and for private customers. Because of these factors the Trial Court in its discretion, could properly exclude this evidence. *Wiggin* v. *Peacock,* 95 N. H. 329, 333.

We have examined the numerous exceptions of both respondents pertaining to the admission and exclusion of evidence. There are among them, the conversation between one Koalick, an expert for the State, and Schoppe and Wiggin, Standard's assigned accountant and head bookkeeper respectively, about the unavailibility of certain records: Koalick's testimony as to the effect of items B and C in the agreement if costs under item A are increased; the evidence of certain transactions between Story and Cote or Standard; the showing to the jury by State's counsel of Cote's Exhibit X, Standard's cash book; evidence of engineer Kimball's proposal as to the Plymouth job and other evidence relating thereto; the use made by State's counsel of the Bradford book. Also included are the evidence of State's experts as to amount of paint, plywood, cement, sand, stone, etc., used or required on the jobs in question, as to actual cost, and as to items not found on examination of jobs; evidence as to $4,500 prepayment on an elevator; sale of foamglass and hardwood flooring, work at Laconia, other than the sprinkler contract, and other State jobs not in indictments; evidence as to the exceeding of appropriations and certain procedures in the Comptroller's office with respect thereto and other matters; the use of Standard's records against both respondents; evidence of a certain formula prepared by one Smith, an expert witness for the State; evidence of percentage of mark-ups on certain items on certain invoices; certain remarks of State's counsel during the course of the trial and their wording of certain questions; inquiries about certain private jobs; evidence of the State being able to obtain certain materials directly from Standard's suppliers; exclusion of Horton's report, of evidence by Schoppe as to Standard's selling cost on private jobs, as to actual cost, and cost plus contracts; the exclusion of the Walker book.

After giving these exceptions careful consideration we are of the opinion that they should all be overruled. Some of the rulings were

required as a matter of law. As to others, there was no abuse of judicial discretion. *State* v. *Hale,* 85 N. H. 403, 407. If any may be considered of doubtful validity no prejudicial error is apparent. *State* v. *Wargo,* 83 N. H. 532, 533; *Emery* v. *Woodward,* 96 N. H. 61, 62.

We have examined the respondents' exceptions to certain portions of the argument of State's counsel to the jury, as to what actual cost is, as to a schedule of labor rates, paying on the sprinkler job before the work started, continuing work after the appropriation therefor had been exhausted, and giving work without bids, looking over the State Hospital to see whether or not they could secure a $100,000 sprinkler job; also as to certain statements in the Story report about which he was asked in cross-examination. Also the portions of the argument about $82,000 in cash, Story being Cote's friend and the serial numbers on the adjustment invoices at Laconia have been considered. We find they were all sufficiently supported and justified by the evidence in the case and the exceptions thereto must be overruled. *State* v. *Bass,* 93 N. H. 172, 176; *Evans* v. *Foster,* 95 N. H. 194, 197.

Turning now to requests for instructions, Cote's request number 3 as to the need to find that he intended to defraud the State in a deliberate or wilful manner was adequately covered in the Court's charge as was his request number 7 as to the necessity of independent evidence to conclude that the elements of knowledge and intent were present. The substance of his request number 8 as to actual cost in so far as warranted was also covered in the charge as was his request number 12 relating to the need of proof of guilt beyond a reasonable doubt. *Manseau* v. *Railroad,* 96 N. H. 7, 13. Requests numbers 10 and 11 dealing with specific portions of the evidence could properly be denied. *Dane* v. *MacGregor,* 94 N. H. 294, 299; *Manseau* v. *Railroad, supra.*

We are also of the opinion that his request number 2 as to the need of actual knowledge by Cote that false representations were being made was adequately covered by the charge and the supplemental charge. Both respondents have argued that the Court by his language in the latter suggested that the jury find as a fact that Cote did know the representations were false when he made them. It reads as follows: "I want to add one word, Gentlemen. I have repeated many times to you the four elements which must obtain to make respondent Cote guilty. I have mentioned false pretense or false representations. The fact I wish to suggest is the respondent

Cote must have known it was false when he made such a representation." A short answer to this argument is that no exception was taken to this supplemental charge and the argument is therefore entitled to no consideration. *Marchand* v. *Company*, 95 N. H. 422, 427. Furthermore we find no error. If the use of the word fact was an unhappy choice the Court had previously charged the jury that they alone are the sole judges of the evidence and "it is not within the province of the Court to attempt to persuade you in any way as to any question of fact bearing on the innocence or guilt of these respondents, and you will draw no inference one way or the other from any ruling made by the Court or anything else the Court has said or done in this case." It is to be presumed that these instructions were heeded by the jury. *Leonard* v. *Manchester*, 96 N. H. 115, 120. The supplemental charge was an amplification of one of the elements of the crime. And it is our opinion that considering the charge as a whole in all probability the jury could not have been misled by this supplemental instruction. *West* v. *Railroad*, 81 N. H. 522, 531; *Lindberg* v. *Swenson*, 95 N. H. 184, 187.

Story's request number 6 as to the elements which the jury must find before he can be convicted was adequately covered in the charge. His request number 7 that there is a presumption of regularity about the acts of a public official was properly denied on the state of the evidence. See *State* v. *Kilcoyne*, 82 N. H. 432, 433. Request number 8 as to the need of proof of guilt beyond a reasonable doubt as well as request number 10 pertaining to the necessity on the part of the State of proving his knowledge and intent were also covered by the charge. Request number 12 as to proving intent by showing other transactions was properly refused as argumentative and the Court charged the jury as to the law with reference to the limited use of this evidence. *Menard* v. *Cashman*, 94 N. H. 428, 432.

Finally Cote excepted to the manner in which the Court charged as to actual cost because he used the language in State's request number 2 which set out the State's contention of its meaning without giving a corresponding charge on the theory of actual cost set forth by Cote. Story, although he did not except, presents this same argument. We find no error in the charge in this respect. The jury was fully and correctly instructed and we find no abuse of discretion in the manner in which the charge applied the rules of law to the specific claims of the parties. *Colby* v. *Lee*, 83 N. H. 303, 309; *Marchand* v. *Company*, *supra*.

Each respondent filed a motion to set aside the verdicts because (1) against the evidence, the weight of evidence and the law, (2) the jury was motivated by passion, prejudice and fell into a plain mistake, (3) they were based upon guess, conjecture, surmise and suspicion, (4) the jury failed to follow the Court's instructions as to its deliberations, (5) for the further reasons already assigned in the motions to quash and to dismiss. Some of the reasons assigned in these motions to set aside the verdicts raise no questions not saved by special exceptions taken during the trial. *State* v. *Grierson*, 96 N. H. 36, 41. As to the others, the record discloses no grounds for disturbing the Court's denial of these motions. *Wisutskie* v. *Malouin*, 88 N. H. 242, 246; *State* v. *Proctor*, 91 N. H. 347, 348.

*Exceptions overruled.*

All concurred.