Merrimack
No. 87-435

### THE STATE OF NEW HAMPSHIRE

v.

### JOHN A. SETTLE, JR.

January 31, 1990

*John P. Arnold,* attorney general (*Tina Schneider,* assistant attorney general, on the brief and orally), for the State.

*James E. Duggan,* chief appellate defender, of Concord, by brief and orally, for the defendant.

BATCHELDER, J. This is a welfare fraud case based on alleged violations of RSA 167:17-b, I(a) (Supp. 1989), which provides that

"[n]o person shall ... [b]y means of an intentionally false statement or misrepresentation or by impersonation or other fraudulent act or device obtain or attempt to obtain, or aid or abet any person in obtaining any assistance or benefit or payment under RSA 161 or RSA 167 to which he is not entitled...."

The defendant was convicted by a jury in Superior Court (*Cann,* J.) upon four indictments under the statute and appeals his conviction to this court upon three grounds: (1) trial court error in permitting amendment to the indictments and, in the alternative, failure in not dismissing them or granting a mistrial; (2) trial court error in ruling that a witness had not waived her privilege against self-incrimination; and (3) trial court error in failing to grant a mistrial where a welfare investigator who was a State witness volunteered information during cross-examination that was inaccurate and otherwise inadmissible. We affirm.

The thrust of the State's case is that the defendant, in violation of RSA 167:17-b, I(a), obtained financial assistance in the months of March, May, July and August, 1984. The funds received were for assistance for the previous month; *e.g.,* the check received in March was for February, and so on. In order to have received the check he obtained, the defendant filed with the welfare department reporting statements, so-called, on or before the tenth day of the month following the reporting period. On the reporting statements in question, defendant stated that he had no income. It would seem to have been simple enough for the State to have charged that the defendant on a particular reporting statement indicated that he had received no income for the reporting period of February 1 through February 28, for instance, when in fact he had received income and by means of such false statements obtained public assistance in violation of RSA 167:17-b, I(a). For reasons that are not apparent

from the thirty-seven volumes of the record of this six-week trial, however, the State in the first instance obtained an indictment as follows:

> "that JOHN ALDEN SETTLE of Concord, New Hampshire in the County of Merrimack February 1st. through February 28th. in the year of our Lord one thousand nine hundred and eighty-four ... did ... make intentional false statements to the N.H. Division of Human Services which would affect his eligibility for assistance, in that ... [he] stated he had no income when in fact he received income as a self-employed legal researcher. . . ."

It should be noted that the precise language of the first indictment refers to "intentional false statements" whereas in the remaining three indictments for the later months the reference is to "intentional false statement." It is not readily understandable why the grand jury shifted from the plural to the singular. The change, however, is not important to this appeal.

The defendant was thus indicted for four separate class B felonies. The awkward language of the indictment was called to the attention of the court on the tenth day of pre-trial hearings, when counsel for the defendant in effect moved to dismiss and argued to the court:

> "So what we are really doing is going to trial today on indictments that they just can't prove. And I think the Court ought to know that before we start. I did not, in my discussions or in my questioning of Cathy Battistelli yesterday—I would say right to her: 'You tell me—referring to the February indictment, you tell me what the alleged false statement is, point it out to me.' And she would point out the monthly report filed in March.
>
> So I guess the basic argument that we have is, what is the real gravamen of this particular offense? It's not receiving the income—it's not receiving the income in April, for instance, that is the gravamen; it's making the false report in May, saying I didn't have income in April. It's the false statement that in and of itself is the real meat of this indictment. And they are alleging in their indictments that there is a false statement in a given month, for instance, April. But instead of relying on a false statement made in April, they want to rely on a false statement made in May, the monthly report.

And if that's the case, you know, it's the State that has selected this monthly reporting system; it's the State that has known all along—I mean, they've had those monthly reports right in their file all along. They could have easily have said, 'Mr. Settle made an intentional false statement on May 4th of 1984 that was false in regard to his income from April of '84 that caused him to get benefits in June of '84.' They could have said that, but they didn't.

So what I want the Court to do is to get an indication from the State as to exactly what statement they are going to rely on to prove each of these months. And if that statement is outside of the indictment period, of the specific indictment period; if, in fact, on the April indictment which says from April 1 to April 30 he made a false statement—if, in fact, they're going to rely on a false statement that was made supposedly in May, then I just can't see going forward on these cases at this point."

The motion, which was styled by the trial court as defendant's motion *in limine*, was denied by its written ruling; however, in an unsolicited maneuver, after jury selection the State filed bills of particulars with respect to each of the four indictments. The prosecutor filed them, as he explained to the court, to "avoid what Mr. Settle indicates was an uncertainty as to the specificity of the indictments and the dates alleged." The State then made its opening statement to the jury.

The defendant made a *pro se* opening statement during which he told the jury:

"The evidence will not show that I made an intentional false statement to anyone on February 1st through February 28th of 1984. It will not show that I made an intentional false statement on April 1st through April 30th of 1984. It will not show that I made an intentional false statement from June 1st through June 30th to 1984, nor that I made a false statement on July 1st through July 31st. I simply didn't make false statements at those times ... I have these indictments, I've prepared a defense for these indictments and that's what you're going to hear me do."

After cross-examination of the State's first witness was nearly completed, at the commencement of the following day's proceedings, the State filed a motion to amend all four indictments by adding to each the language "for the reporting period." After a hearing on the motion, the court once again in a written ruling,

having found no prejudice to the defendant, either in his ability to understand the charges or in the preparation of his defense, granted the State's motion over the defendant's objection. The defendant's first claim here is that upon such a record, he was entitled to have the indictments dismissed, or at least to have a mistrial declared. The reasons for our disagreement with his contentions follow.

The defendant's attack upon the sufficiency of the indictment must be viewed in light of constitutional safeguards set forth in the State and Federal Constitutions: part I, article 15, of the New Hampshire Constitution and amendments V and VI to the Constitution of the United States. The notions embodied in these constitutional provisions are those which protect the accused from surprise at trial, give reliance upon what must be defended against and provide notice of what the grand jury asserts to be the conduct which is violative of the law. In addition to matters of notice, there is also the notion of protection against being prosecuted another day for the same conduct.

The defendant has relied at trial, in his pleadings, and in this court upon both State and federal constitutional protection in his "sufficiency of indictment" and "indictment amendment" claims. In view of the fact that in such matters the federal constitutional provisions allow no greater protection than does our own constitution, we decide these issues on State constitutional law. *State v. Ball,* 124 N.H. 226, 232, 471 A.2d 347, 351 (1983); *State v. Scarborough,* 124 N.H. 363, 368, 470 A.2d 909, 913 (1983).

Prosecutors may seek to take some refuge in RSA 601:8, which provides that

> "[n]o indictment, complaint, return, process, judgment or other proceeding in any criminal case in the courts or course of justice shall be abated, quashed or reversed for any error or mistake where the person or case may be rightly understood by the court, nor through any defect or want of form or addition, and courts and justices may, on motion, order amendments in any such case."

This statute, however, like all statutes, stands in the shadow of the constitution, and was interpreted shortly after its passage (July 3, 1863) by this court in a case involving stolen oxen whose value had been omitted from the indictment and was sought to be inserted by way of an amendment. The court's language is helpful:

"The inquiry, then, turns upon the point whether the amendment here is matter of form or substance, and, from what has already been seen, it is quite clear that it is matter of substance, and therefore cannot be amended. The character of the offence, whether grand or simple larceny, depends upon the value of the things stolen, and it is obviously for the grand jury to determine that point. Should the court direct an amendment so as to make it a charge for grand larceny, the respondent would be put upon trial for an offence of which he has not been accused by the grand jury."

*State v. Goodrich,* 46 N.H. 186, 188 (1865). Our inquiry then leads us to the question as to what the grand jury charge was and whether the prosecution's bills of particulars and amendment supplied what was otherwise a legal insufficiency or changed what the grand jury had returned under oath. *See State v. Bean,* 117 N.H 185, 188, 371 A.2d 1152, 1153 (1977); *State v. Inselburg,* 114 N.H. 824, 827, 330 A.2d 457, 459 (1974); R. McNamara, 1 New Hampshire Practice, Criminal Practice and Procedure § 310, at 121–24 (Supp. 1988) and § 474, at 314–15 (1980).

■ As originally charged, the indictments alleged in substance that the defendant made false statements to the New Hampshire Division of Human Services which affected his eligibility for assistance. The original wording of the indictment, although lacking in clarity, precision, and crispness of expression, nevertheless apprised the defendant that the grand jurors believed that there was probable cause for him to answer to the charge of unlawful receipt of public assistance based, in part, upon false statements bearing upon his eligibility. What was lacking was the specificity as to when and in what medium the statements were made. The question is a simple one: was the defendant apprised of the factual basis of the charge? In answering this question in the affirmative, we are guided by language in *State v. Story,* 97 N.H. 141, 83 A.2d 142 (1951).

"The true test is not whether the indictment could possibly be made more definite and certain but rather whether it alleges every element of the offense charged in language sufficiently definite to apprise the respondents of what they must be prepared to meet for trial. It also stands to reason that the circumstances surrounding the particular offense may of necessity affect the degree of definiteness which can reasonably be required of the State in its indictment."

*Id.* at 146, 83 A.2d at 147 (citations omitted).

■ The defendant argues that there is a strong parallel between the case at hand and cases where the indictment alleges perjury. He argues that in perjury cases the defendant is entitled to further specificity concerning the alleged "false statement" upon which the granting of benefits turned. The logical extension of this argument is that the precise language of the allegedly false statement must be set forth in the indictment in this case. This argument falls wide of the mark. In an indictment for perjury, the making of the assertion under oath concerning a particular material fact is the gravamen of the crime, *United States v. Williams* 874 F.2d 968, 980 (5th Cir. 1989), whereas here the crime is that of receiving benefits from the public based upon a false statement or representation.

■ Because the defendant was charged with having obtained the four payments in question upon the intentional false statements that he had received no income, when in fact he had received income as a self-employed legal researcher, we believe that the trial court was correct in permitting the State to file its bills of particulars and amendments to the indictments. The trial court determined that the defendant was not thereby prejudiced, and we agree. It is certain that the defendant may not at any time in the future be prosecuted for receiving the four payments upon which this case was founded.

The defendant asserts two further instances of trial court error upon which he claims entitlement to reversal of the court's decision. He first seeks a holding by us that where a witness has already testified and incriminated herself, as in this case at least, she has waived the privilege against self-incrimination. As a second matter, he asks us to hold that a mistrial should have been declared when a witness gave purportedly nonresponsive answers which were arguably inadmissible. Applying what we perceive to be settled law to the facts upon which the defendant asserts error in the trial court's ruling, we conclude that none was committed.

In the first matter, relating to the privilege against self-incrimination, it appears that Roland Hopps was an important State witness in the presentation of the case-in-chief. His testimony related to his relationship with the defendant, placing particular emphasis on his involvement in, and knowledge of, payment made by checks and in cash to the New Hampshire Civil Rights Association, as well as the manner in which disbursements were made for the association. The defendant and Hopps comprise nearly

the total membership of the New Hampshire Civil Rights Association, a group dedicated to educating people about, and helping them to enforce, their civil rights inside the legal system, for a fee.

The substance of Hopps' testimony was that the defendant received income by means of payment made to the New Hampshire Civil Rights Association which inured in part at least to the defendant's benefit. The defendant correctly asserts that "[a]t trial, Hopps testified that he co-signed several of the checks which clients gave Settle ... that Settle would cash the check, give Hopps 'ten, fifteen dollars and John [Settle] would get the rest of the cash.'" One of the defendant's claims was that whatever income he received in this manner was not used for his own personal benefit, but rather to pay the expenses of the association. Hopps' testimony tended to prove personal use of the income by Settle, thereby putting Settle's welfare department reporting statements at odds with the facts. Hopps had a reasonably close association with the New Hampshire Civil Rights Association and its checking account. The following bit of testimony bears out the relationship:

"Question: Who had access to those checking accounts?

Answer: Mr. Settle. And after being with him for about six or seven months, John would go out of town and he would sign checks in blank, and if anything came in, I was to issue those checks against the bills. I believe that was the only time.

Question: Did you have personal checking accounts or financial systems to deal with your own personal expenses?

Answer: Yes, I did.

Question: And where were those accounts located?

Answer: Those were with the New Hampshire Bank here in Concord."

The cross-examination of Hopps found in some instances New Hampshire Civil Rights Association expenses and income transactions commingled in Hopps' personal checking account. These lines of inquiries were calculated to attack Hopps' credibility. To further this point the defense went on with the witness Donna Rideout in an effort to show an equally informal financial relationship between Hopps and Rideout, who was referred to variously as Hopps' girl friend, roommate, and landlord. Hopps testified that he paid money

to Donna Rideout as rent when she needed it. Rideout, when questioned, verified this arrangement and admitted that in her capacity as landlord she had received fuel assistance payments. At this point in her testimony, she apparently realized that she had indicated that she had violated the law in receiving both financial assistance and rent, and she said she would "like to have a lawyer." Her examination was suspended while she sought legal advice, and from then on she claimed the fifth amendment privilege against testifying further. The trial court listened to further questioning of Rideout outside the presence of the jury, where she claimed the privilege in response to every question. The questions dealt with rent payments, the living arrangement she had with Hopps and statements she had made to the welfare department. The court, supporting her fifth amendment claim, granted a motion to strike her testimony in its entirety and advised the jury that her testimony was not to be considered in this case. Against this background, we are called upon to determine whether or not the trial court's rulings were correct.

■ The burden is upon the defendant in matters such as these to meet the two elements of the test set forth in *State v. Lavallee*, 119 N.H. 207, 210, 400 A.2d 480, 482 (1979). Under *Lavallee* the defendant has the burden to establish (1) "the impropriety of the trial court's granting of the claim [of the privilege against self-incrimination] ..." and (2) "the prejudicial nature of this action to his own cause." *Id.* at 210, 400 A.2d at 482 (quoting C. McCormick, Evidence 296 n.38 (2d ed. 1972)). The defendant seems to contend, with respect to the impropriety of granting the claim, that the court erred because the witness had waived the claim by statements which tended to incriminate her in some aspect of welfare fraud before she sought the privilege. We disagree.

■ The defendant relies in this aspect of the case upon the holding of the United States Supreme Court in *Rogers v. United States*, 340 U.S. 367 (1951). The *Rogers* case is instructive, but not on the proposition upon which the defendant relies. Jane Rogers was a witness before a grand jury investigating activities of the Communist Party. In response to questions, she relied upon the privilege and refused to disclose the name of the person to whom she had given certain books and documents relating to Party activity. Prior to her claim of privilege, however, she had testified that she had been the custodian of the Party's books and that she was the Party treasurer. The Court reasoned that she had waived the privilege by disclosing the incriminating fact that she was a

Communist. *Id.* at 372–73. The language employed by the Court, however, leads us to hold as we do in the case before us. A witness "cannot invoke the privilege where a response to the specific question in issue would not further incriminate her." *Id.* at 373. Here, the witness Rideout, however, were she to have answered further questions, would undoubtedly have given information that would have tended to incriminate her in various other aspects of welfare fraud. In *Rogers* the witness could not further incriminate herself by answering the questions put to her. Rideout, however, was not in that position, as it could be found that she would *further* incriminate herself. The trial court's ruling was appropriate under the circumstances.

 The court was also correct in finding no prejudice to the defendant's cause by reason of a ruling favorable to the witness Rideout. As the trial court pointed out, there was ample opportunity on cross-examination of Roland Hopps to explore the financial machinations of Hopps' personal and business affairs. The defendant was not, therefore, prejudiced by the fact that Rideout's testimony, insofar as it was given, was stricken.

The last ground of claimed trial court error is the assertion that a mistrial should have been granted when a State witness, a welfare investigator, volunteered testimony claimed to be inaccurate and inadmissible as evidence. The case against the defendant was investigated by the welfare department for a period of time prior to the indictment. The investigation was the primary responsibility of Cathy Battistelli. In the course of her investigation, and pursuant to appropriate warrants, Battistelli conducted an extensive search of the New Hampshire Civil Rights Association office, which was also the defendant's house. At the outset, it is noteworthy that the responses claimed to be inaccurate and inadmissible were elicited by the defense during cross-examination. The answers which the defendant claims entitled him to a mistrial arose during the following colloquy:

"Question: During the course of your review of the records that had been taken, did you locate any duplicate set of bank records, a false set of bank records for the IRS or for the welfare people, or anything along that line?

Answer: I did not—pursuant to the material that was seized, there were no financial records that were seized.

Question: So you didn't find any duplicate or second set of records?

Answer: No, I did not. But we also did not search the top part of the building, in which—*I think it was behind the eaves that I later learned were hidden documents and files.*

Question: Where did you learn that from?

Answer: Concord Police Department."

(Emphasis added.) Battistelli also testified later:

"Question: Do you have a report of a statement made by Roland Hopps, telling you that there were some documents secreted in the upstairs at any time?

Answer: Roland Hopps didn't tell me that. I already indicated that was from a Concord Police officer. *Roland Hopps told me that John Settle had contacted him and said, 'Welfare is investigating me. If they contact you, you don't know anything.'*

Question: Do you have a report that says Roland Hopps told you, prior to the search, *that John Settle knew they were coming?*

Answer: *I believe it's in a memo form.* I believe you have it in your possession.

* * *

Question: I want to make sure I understand you. Roland Hopps told you that Mr. Settle contacted him before the search was ever done and said that you people were coming?

Answer: He said that—well, Mr. Settle knew he was under investigation and that if welfare contacted Hopps, that Hopps was to say he did not know anything.

Mr. Settle also contacted me himself prior to the search."

(Emphasis added.)

With respect to the first colloquy, the defendant neither objected to nor moved to strike the offensive answers. At the conclusion of the second colloquy the defendant, who appeared *pro se*, asked the court to declare a mistrial, which was denied. Still later in the proceedings, during what appears to be the fifth day of the cross-examination of Battistelli, the following took place:

"Question: All right. Now isn't it fair to say that what you have up there, what you have given or assessed Mr. Settle as self-employment income is the only income you know of for the whole period of time that you were investigating?

Answer: That's the only income which could be proven at that time. *There were other individuals that were afraid to come forward and talk about the monies that they had paid to Mr. Settle.*"

(Emphasis added.) On this occasion, the defense moved for a mistrial and the court again denied the motion.

With respect to the first two portions of the cross-examination, the court gave the jury the following instructions:

"Well, members of the jury, there were two issues that came out during the cross-examination of this witness. One . had to do with whether or not any materials were secreted in the eaves; and also, there was some suggestion that Mr. Settle had advance notice of or warning about the search.

And with reference to both of those answers of this witness, I ask you to disregard them completely. There was no evidence that there was any material secreted in the eaves of Mr. Settle's premises or that he was given any—that he had any advance notice of any kind about any search that was going to be conducted of his premises.

So with reference to those two subjects, I ask you to disregard any testimony from this witness about those matters. Give it no weight whatsoever."

At the conclusion of the last exchange the court instructed the jury to "disregard what she said. Just don't give it any weight at all."

This court has set forth a simple standard by which to determine whether a mistrial should be granted in situations where inadmissible testimony has been volunteered. "The remarks or the conduct must be more than merely inadmissible; they must constitute an irreparable injustice that cannot be cured by jury instructions." *State v. Lemire*, 130 N.H. 552, 555, 543 A.2d 425, 426 (1988); *see also State v. Scarlett*, 118 N.H. 904, 906, 395 A.2d 1244, 1246 (1978) (because of irreparable prejudice, and despite trial court curative instruction, defendant was granted mistrial after State introduced blood-stained bedspread without establishing proper foundation). It is interesting to note in passing that the

Battistelli testimony with which the defendant takes issue is testimony which was elicited during cross-examination and was pursued after Battistelli gave the responses now claimed to be prejudicial. We incline to the view that the trial court was correct in denying a mistrial upon the authority of *Scarlett* and *Lemire*. As a related matter, it is also arguable that in failing to object contemporaneously to the testimony claimed to be inadmissible the defendant failed to preserve these issues for review. *State v. Dukette*, 127 N.H. 540, 544, 506 A.2d 699, 703 (1986).

*Affirmed.*

SOUTER, J., did not sit; the others concurred.