ROGERS *v.* UNITED STATES.

No. 20.   Argued November 7, 1950.—Decided February 26, 1951.

*Samuel D. Menin* argued the cause and filed a brief for petitioner.

*Solicitor General Perlman* argued the cause for the United States. With him on the brief were *Assistant Attorney General McInerney, John F. Davis* and *J. F. Bishop.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

This case arises out of an investigation by the regularly convened grand jury of the United States District Court for the District of Colorado. The books and records of the Communist Party of Denver were sought as necessary to that inquiry and were the subject of questioning by the grand jury. In September, 1948, petitioner, in response to a subpoena, appeared before the grand jury. She testified that she held the position of Treasurer of the Communist Party of Denver until January, 1948, and that, by virtue of her office, she had been in possession of membership lists and dues records of the Party. Petitioner denied having possession of the records and testified that she had turned them over to another. But she refused to identify the person to whom she had given the Party's books, stating to the court as her only reason: "I don't feel that I should subject a person or persons to the same thing that I'm going through."[1] The court thereupon committed petitioner to the custody of the marshal

---

[1] Transcript, p. 39 (September 21, 1948):

"The Court: Now, what is the question?

"Mr. Goldschein: Who has the books and records of the Communist

until ten o'clock the next morning, expressly advising petitioner of her right to consult with counsel.[2]

The next day, counsel for petitioner informed the court that he had read the transcript of the prior day's proceedings and that, upon his advice, petitioner would answer the questions to purge herself of contempt.[3] However,

---

Party of Denver now. Who did Mrs. Rogers give those books up to as she says she gave them up in January of this year.

"The Court: Do you care to answer that question, madam?

"Mrs. Rogers: I do not.

"The Court: What?

"Mrs. Rogers: I do not, and that's what I told them.

"The Court: Why won't you answer?

"Mrs. Rogers: I don't feel that I should subject a person or persons to the same thing that I'm going through.

"The Court: It is the order or finding of the Court that you should answer those questions. Now, will you do that?

"Mrs. Rogers: No."

[2] Transcript, p. 40 (September 21, 1948):

"The Court: You will be detained until tomorrow morning until ten o'clock. In the meantime, you may consult counsel and have a hearing tomorrow morning at ten o'clock on your reasons for refusal to answer questions.

"Mrs. Rogers: I can consult counsel between now and then?

"The Court: Yes, but you will be in the custody of the marshal all the time. Get your counsel and bring him over here if you want to, but you will have to be in the custody of the marshal and spend the night in jail, I'm afraid."

[3] Transcript, pp. 43, 49 (September 22, 1948):

"Mr. Menin [After entering his appearance on behalf of petitioner]: In regard to the witness Rogers, I've read the transcript of what has transpired in court here yesterday; and I believe that upon my advice she will answer questions which were propounded to her.

.        .        .        .        .

"Mr. Menin: As to the witness Jane Rogers, I think she will purge herself of her contempt by answering the questions.

"The Court: In the case of the witness Rogers, then, the order of the Court is that she return to the Grand Jury room and if she purges herself of contempt, then upon bringing the matter back to the Court, she will be discharged. In the meantime, she will remain in custody."

upon reappearing before the grand jury, petitioner again refused to answer the question. The following day she was again brought into court. Called before the district judge immediately after he had heard oral argument concerning the privilege against self-incrimination in another case, petitioner repeated her refusal to answer the question, asserting this time the privilege against self-incrimination.[4] After ruling that her refusal was not privileged, the district judge imposed a sentence of four months for contempt. The Court of Appeals for the Tenth Circuit affirmed, 179 F. 2d 559 (1950), and we granted certiorari, 339 U. S. 956 (1950).

If petitioner desired the protection of the privilege against self-incrimination, she was required to claim it.

---

[4] "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U. S. Const., Amend. V. The proceedings leading to the claim of privilege by petitioner appear at Transcript, pp. 77–78 (September 23, 1948):

"The Court: . . . Madam, do you still persist in not answering these questions?

"Mrs. Rogers: Well, on the basis of Mr. Menin's statements this morning—

"The Court: Will you please answer the question yes or no?

"Mrs. Rogers: Well, I think that's rather undemocratic[.] I'm a very honest person. Would you mind letting me consider—

"The Court: Make any statement you wish.

"Mrs. Rogers: Well, as I said before, I'm a very honest person and I'm not acquainted with the tricks of legal procedure, but I understand from the reading of these cases this morning that I am—and I do have a right to refuse to answer these questions, on the basis that they would tend to incriminate me, and you read it yourself, that I have a right to decide that.

"The Court: You have not the right to say.

"Mrs. Rogers: According to what you read, I do. I stand on that.

"The Court: All right. If you will make no changes, it is the judgment and sentence of the court you be confined to the custody of the Attorney General for four months. Call the next case."

*United States* v. *Monia,* 317 U. S. 424, 427 (1943). The privilege "is deemed waived unless invoked." *United States* v. *Murdock,* 284 U. S. 141, 148 (1931).[5] Furthermore, the decisions of this Court are explicit in holding that the privilege against self-incrimination "is solely for the benefit. of the witness,"[6] and "is purely a personal privilege of the witness."[7] Petitioner expressly placed her original declination to answer on an untenable ground, since a refusal to answer cannot be justified by a desire to protect others from punishment,[8] much less to protect another from interrogation by a grand jury. Petitioner's claim of the privilege against self-incrimination was pure afterthought. Although the claim was made at the time of her second refusal to answer in the presence of the court, it came only after she had voluntarily testified to her status as an officer of the Communist Party of Denver. To uphold a claim of privilege in this case would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony.

The privilege against self-incrimination, even if claimed at the time the question as to the name of the person to whom petitioner turned over the Party records was asked, would not justify her refusal to answer. As a preliminary matter, we note that petitioner had no privilege with respect to the books of the Party, whether it

---

[5] Citing *Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 113 (1927). See *Smith* v. *United States,* 337 U. S. 137, 147 (1949); Corwin, The Supreme Court's Construction of the Self-Incrimination Clause, 29 Mich. L. Rev. 1, 198–199 (1930).

[6] *United States* v. *Murdock,* 284 U. S. 141, 148 (1931).

[7] *Hale* v. *Henkel,* 201 U. S. 43, 69 (1906). *McAlister* v. *Henkel,* 201 U. S. 90, 91 (1906).

[8] *Brown* v. *Walker,* 161 U. S. 591, 609 (1896); *Hale* v. *Henkel,* 201 U. S. 43, 69–70 (1906).

be a corporation[9] or an unincorporated association.[10] Books and records kept "in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate [their keeper] personally." *United States* v. *White,* 322 U. S. 694, 699 (1944).[11] Since petitioner's claim of privilege cannot be asserted in relation to the books and records sought by the grand jury, the only claim for reversal of her conviction rests on the ground that mere disclosure of the name of the recipient of the books tends to incriminate.

In *Patricia Blau* v. *United States,* 340 U. S. 159 (1950), we held that questions as to connections with the Communist Party are subject to the privilege against self-incrimination as calling for disclosure of facts tending to criminate under the Smith Act.[12] But petitioner's conviction stands on an entirely different footing, for she had freely described her membership, activities and office in the Party. Since the privilege against self-incrimination

---

[9] *Wilson* v. *United States,* 221 U. S. 361 (1911); *Wheeler* v. *United States,* 226 U. S. 478 (1913); *Grant* v. *United States,* 227 U. S. 74 (1913); *Essgee Co.* v. *United States,* 262 U. S. 151 (1923).

[10] *Brown* v. *United States,* 276 U. S. 134 (1928); *United States* v. *White,* 322 U. S. 694 (1944). Cf. *United States* v. *Fleischman,* 339 U. S. 349, 358 (1950).

[11] See also the cases cited in notes 7 and 8, *supra.* The privilege does not attach to the books of an organization, whether or not the books in question are "required records" of the type considered in *Shapiro* v. *United States,* 335 U. S. 1 (1948).

[12] Membership in the Communist Party was not, of itself, a crime at the time the questions in this case were asked. And Congress has since expressly provided, in the Internal Security Act of 1950, Act of Sept. 23, 1950, 64 Stat. 987, 992, § 4 (f), that "neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation of subsection (a) or subsection (c) of this section or of any other criminal statute." We, of course, express no opinion as to the implications of this legislation upon the issues presented by these cases.

presupposes a real danger of legal detriment arising from the disclosure, petitioner cannot invoke the privilege where response to the specific question in issue here would not further incriminate her. Disclosure of a fact waives the privilege as to details. As this Court stated in *Brown* v. *Walker,* 161 U. S. 591, 597 (1896):

> "Thus, if the witness himself elects to waive his privilege, as he may doubtless do, since the privilege is for his protection and not for that of other parties, and discloses his criminal connections, he is not permitted to stop, but must go on and make a full disclosure." [13]

Following this rule, federal courts have uniformly held that, where criminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details.[14] The decisions of this Court in *Arndstein* v. *McCarthy,* 254 U. S. 71 (1920), and *McCarthy* v. *Arndstein,* 262 U. S. 355 (1923), further support the conviction in this case for, in sustaining the privilege on each appeal, the Court stressed the absence of any previous "admission of guilt *or incriminating facts,*" [15] and relied particularly upon *Brown* v. *Walker, supra,* and *Foster* v. *People,* 18 Mich. 266 (1869). The holding of the Michigan court is entirely apposite here:

> "[W]here a witness has voluntarily answered as to materially criminating facts, it is held with uniformity

---

[13] Quoted with approval in *Powers* v. *United States,* 223 U. S. 303, 314 (1912).

[14] *United States* v. *St. Pierre,* 132 F. 2d 837 (C. A. 2d Cir., 1942); *Buckeye Powder Co.* v. *Hazard Powder Co.,* 205 F. 827, 829 (D. C. Conn., 1913).

[15] 262 U. S. at 359 (emphasis supplied). The *Arndstein* appeals, like the present case, arose out of an involuntary examination. The Court reserved, as we do here, the problems arising out of a possible abuse of the privilege against self-incrimination in adversary proceedings. Compare state court decisions collected in 147 A. L. R. 255 (1943).

that he cannot then stop short and refuse further explanation, but must disclose fully what he has attempted to relate." 18 Mich. at 276.[16]

Requiring full disclosure of details after a witness freely testifies as to a criminating fact does not rest upon a further "waiver" of the privilege against self-incrimination. Admittedly, petitioner had already "waived" her privilege of silence when she freely answered criminating questions relating to her connection with the Communist Party. But when petitioner was asked to furnish the name of the person to whom she turned over Party records, the court was required to determine, as it must whenever the privilege is claimed, whether the question presented a reasonable danger of further crimination in light of all the circumstances, including any previous disclosures. As to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a "real danger" of further crimination.[17] After petitioner's admission that she held the office of Treasurer of the Communist Party of Denver, disclosure of acquaintance with her successor presents no more than

---

[16] VIII Wigmore, Evidence (1940), § 2276, quotes from *Foster* v. *People*, 18 Mich. 266 (1869), as authoritative and summarizes the law as follows:

"The case of the *ordinary witness* can hardly present any doubt. He may waive his privilege; this is conceded. He waives it by exercising his option of answering; this is conceded. Thus the only inquiry can be whether, by *answering as to fact X, he waived it for fact Y.* If the two are related facts, parts of a whole fact forming a single relevant topic, then his waiver as to a part is a waiver as to the remaining parts; because the privilege exists for the sake of the criminating fact as a whole." (Emphasis in original.)

[17] *Heike* v. *United States,* 227 U. S. 131, 144 (1913). *Brown* v. *Walker,* 161 U. S. 591, 600 (1896).

a "mere imaginary possibility" [18] of increasing the danger of prosecution.[19]

Petitioner's contention in the Court of Appeals and in this Court has been that, conceding her prior voluntary crimination as to one element of proof of a Smith Act violation, disclosure of the name of the recipient of the Party records would tend to incriminate as to the different crime of conspiracy to violate the Smith Act. Our opinion in *Patricia Blau* v. *United States, supra,* at 161, explicitly rejects petitioner's argument for reversal here in its holding that questions relating to activities in the Communist Party are criminating both as to "violation of (or conspiracy to violate) the Smith Act." Of course, at least two persons are required to constitute a conspiracy, but the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown.[20]

*Affirmed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE BLACK, with whom MR. JUSTICE FRANKFURTER and MR. JUSTICE DOUGLAS concur, dissenting.

Some people are hostile to the Fifth Amendment's provision unequivocally commanding that no United States

---

[18] *Mason* v. *United States,* 244 U. S. 362, 366 (1917).

[19] *United States* v. *St. Pierre,* 132 F. 2d 837 (C. A. 2d Cir., 1942), presented a closer question since the "detail" which St. Pierre was required to divulge would identify a person without whose testimony St. Pierre could not have been convicted of a crime. We, of course, do not here pass upon the precise factual question there decided by the Court of Appeals.

[20] *Browne* v. *United States,* 145 F. 1, 13 (C. A. 2d Cir., 1905); *Donegan* v. *United States,* 287 F. 641, 648 (C. A. 2d Cir., 1922); *Pomerantz* v. *United States,* 51 F. 2d 911, 913 (C. A. 3d Cir., 1931);

official shall compel a person to be a witness against himself. They consider the provision as an outmoded relic of past fears generated by ancient inquisitorial practices that could not possibly happen here. For this reason the privilege to be silent is sometimes accepted as being more or less of a constitutional nuisance which the courts should abate whenever and however possible. Such an end could be achieved by two obvious judicial techniques: (1) narrow construction of the scope of the privilege; (2) broad construction of the doctrine of "waiver." Any attempt to use the first of these methods, however, runs afoul of approximately 150 years of precedent. See *Patricia Blau* v. *United States,* 340 U. S. 159, and cases there cited. This Court has almost always construed the Amendment broadly [1] on the view that compelling a person to convict himself of crime is "contrary to the principles of a free government" and "abhorrent to the instincts of an American"; that while such a coercive practice "may suit the purposes of despotic power . . . it cannot abide the pure atmosphere of political liberty and personal freedom." *Boyd* v. *United States,* 116 U. S. 616, 632; but cf. *United States* v. *Murdock,* 284 U. S. 141.

The doctrine of waiver seems to be a more palatable but equally effective device for whittling away the protection afforded by the privilege, although I think today's application of that doctrine cannot be supported by our past decisions. Of course, it has never been doubted that

---

*Grove* v. *United States,* 3 F. 2d 965, 967 (C. A. 4th Cir., 1925); *McDonald* v. *United States,* 9 F. 2d 506, 507 (C. A. 8th Cir., 1925); *Rosenthal* v. *United States,* 45 F. 2d 1000, 1003 (C. A. 8th Cir., 1930); *Didenti* v. *United States,* 44 F. 2d 537, 538 (C. A. 9th Cir., 1930). See also *Feder* v. *United States,* 257 F. 694, 697 (C. A. 2d Cir., 1919); *Worthington* v. *United States,* 64 F. 2d 936, 939 (C. A. 7th Cir., 1933).

[1] "This provision [against self-incrimination] must have a broad construction in favor of the right which it was intended to secure." *Counselman* v. *Hitchcock,* 142 U. S. 547, 562.

a constitutional right could be *intentionally* relinquished and that such an intention might be found from a "course of conduct." *Shepard* v. *Barron,* 194 U. S. 553, 568. But we have said that intention to waive the privilege against self-incrimination is not "lightly to be inferred" and that vague and uncertain evidence will not support a finding of waiver. *Smith* v. *United States,* 337 U. S. 137, 150, relying on *Johnson* v. *Zerbst,* 304 U. S. 458, 464, and cases there cited. In the case of this petitioner, there is no evidence that she intended to give up her privilege of silence concerning the persons in possession of the Communist Party records. To the contrary, the record—as set out in the Court's opinion—shows she intended to avoid answering the question on whatever ground might be available and asserted the privilege against self-incrimination at the first moment she became aware of its existence.[2] This fact and the cases which make it crucial are ignored in the decision today.

Apparently, the Court's holding is that at some uncertain point in petitioner's testimony, regardless of her intention, admission of associations with the Communist Party automatically effected a "waiver" of her constitutional protection as to all related questions.[3] To adopt such a rule for the privilege against self-incrimination,

---

[2] While it has been held that failure specifically to invoke the privilege prior to final judgment constituted a waiver, *United States ex rel. Vajtauer* v. *Commissioner of Immigration,* 273 U. S. 103, 113; *United States* v. *Murdock,* 284 U. S. 141, 148, such cases are not controlling here. Before final judgment was entered against this petitioner, she asserted the privilege not to incriminate herself under federal law, and was sentenced for standing on this ground. See Appendix following this opinion, p. 381.

[3] The Court's reliance on *Brown* v. *Walker,* 161 U. S. 591, as indicating that the privilege can be waived unintentionally is misplaced. For in the *Brown* case, it was said that "if the witness himself *elects* to waive his privilege, . . . he is not permitted to stop, but must go on and make a full disclosure." (Emphasis supplied.) *Id.,* at 597.

when other constitutional safeguards must be knowingly waived, relegates the Fifth Amendment's privilege to a second-rate position. Moreover, today's holding creates this dilemma for witnesses: On the one hand, they risk imprisonment for contempt by asserting the privilege prematurely; on the other, they might lose the privilege if they answer a single question. The Court's view makes the protection depend on timing so refined that lawyers, let alone laymen, will have difficulty in knowing when to claim it.[4] In this very case, it never occurred to the trial judge that petitioner waived anything.[5] And even if voluntary testimony can under some circumstances work a waiver, it did not do so here because what petitioner stated to the grand jury "standing alone did not amount to an admission of guilt or furnish clear proof of crime . . . ." *Arndstein* v. *McCarthy,* 254 U. S. 71, 72.[6]

---

[4] The practical difficulties inherent in the rule announced by the Court are made apparent by a reading of the opinions in *United States* v. *St. Pierre,* 132 F. 2d 837.

[5] See note 11 and accompanying text, *infra.*

[6] Today's opinion seeks to derive a looser test from certain negative language in the subsequent case of *McCarthy* v. *Arndstein,* 262 U. S. 355, 359, where it was said that if "the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short . . . ." In that very case, however, the Court quoted with approval the minimum rule it had previously announced. *Id.,* at 358. Moreover, in stating the reason why Arndstein had *not* waived his privilege, the Court said: "And since we find that none of the answers which had been voluntarily given by Arndstein, either by way of denials or partial disclosures, amounted to an admission or showing of guilt, we are of opinion that he was entitled to decline to answer further questions when so to do might tend to incriminate him." *Id.,* at 359–360.

It is also suggested that the Michigan case of *Foster* v. *People,* 18 Mich. 266, was adopted as the federal rule by this Court in *McCarthy* v. *Arndstein, supra,* at 359. Although the *Foster* case was there cited, no acceptance was intended of the language in the Michigan

Furthermore, unlike the Court, I believe that the question which petitioner refused to answer did call for additional incriminating information. She was asked the names of the persons to whom she had turned over the Communist Party books and records. Her answer would not only have been relevant in any future prosecution of petitioner for violation of the Smith Act but also her conviction might depend on testimony of the witnesses she was thus asked to identify. For these reasons the question sought a disclosure which would have been incriminating to the highest degree. Certainly no one can say that the answer "[could not] possibly be used as a basis for, or in aid of, a criminal prosecution against the witness . . . ." *Brown* v. *Walker,* 161 U. S. 591, 597.[7]

The records in this and in the companion cases [8] reveal a flagrant disregard of the constitutional privileges of petitioner and others called before the grand jury. The Special United States Attorney in charge made unwar-

---

decision which a majority quotes today. That the Court would not have accepted this quotation is shown by the fact that it placed reliance on an English case, *Regina* v. *Garbett,* 2 C. & K. 474, 495, which was summarized as holding the following: "[I]t makes no difference in the right of a witness to protection from incriminating himself that he has already answered in part, he being 'entitled to claim the privilege at any stage of the inquiry.'" *McCarthy* v. *Arndstein, supra,* at 359.

[7] I do not understand the Court's holding to rely on the statement in the opinion that "petitioner had no privilege with respect to the books of the Party . . . ." This statement of course is not relevant in the present case where there is no issue of compelling petitioner to turn over unprivileged documents in her possession. But if the Court does intend to suggest that a witness is not privileged in refusing to answer incriminating *questions* merely because those questions relate to unprivileged documents, then I must point out that the decision in this case is entirely inconsistent with our recent unanimous decision in *Patricia Blau* v. *United States,* 340 U. S. 159, note 1.

[8] *Patricia Blau* v. *United States, supra; Irving Blau* v. *United States,* 340 U. S. 332.

ranted assurances that might well have misled witnesses unable to match legal wits with him into making self-incriminating admissions.[9]   Although petitioner had been allowed on a previous day to consult with counsel, at the time she was brought before the District Court for final consideration of her case the judge arbitrarily refused to permit counsel to speak in her behalf, summarily commanding the attorney to sit down, and almost immediately thereafter sentenced petitioner to four months' imprisonment.[10]   In convicting her, the district judge neither held nor intimated that the privilege against self-incrimination had been waived.[11]   His erroneous belief was that intimate association with the Communist Party was not an incriminating fact.   Therefore, although the Court now describes petitioner's claim of privilege as

---

[9] Although the Court of Appeals upheld the convictions of most of the witnesses called before the grand jury, it made the following comment concerning the conduct of the Special United States Attorney: "[His] stock statement to the witness that she was not under investigation and that the grand jury was not proceeding against her, was not warranted.   It was not for him to say what the scope of the grand jury's investigation was; neither was his statement a substitute for her constitutional protection." *Rogers* v. *United States,* 179 F. 2d 559, 563.   Other "irregularities" in the proceedings below were also pointed out.   *Id.,* at 561.   Conduct of the same prosecutor during a similar grand jury investigation in Los Angeles was criticized by judges of the Ninth Circuit in *Alexander* v. *United States,* 181 F. 2d 480.   There it was said that the government attorney "pursued the same tactics tending to put the witness off his guard . . . ."   *Id.,* at 482.

[10] The transcript of this portion of the proceedings below is set out in the Appendix, *post,* p. 381.

[11] The district judge's sole reference to "waiver" was not made in the case of petitioner.   In addressing one of the other witnesses, however, the judge said, "Of course, anything you testify to, unless you *signed* a waiver, can't be used against you in any trial hereafter. That's the law, isn't it?" (Emphasis supplied.)   The conviction of this witness, Nancy Wertheimer, was the only one reversed by the Court of Appeals.   *Rogers* v. *United States,* 179 F. 2d 559.

an "afterthought," it seems to me that the real "after-thought" in this case is the affirmance of the judgment below on a "waiver" or equivalent theory. More important, however, I believe that today's expansion of the "waiver" doctrine improperly limits one of the Fifth Amendment's great safeguards.[12]

I would reverse the judgment of conviction.

APPENDIX TO OPINION OF MR. JUSTICE BLACK.

The following is the full transcript of proceedings at the time the judgment now under review was entered:

"The Court: . . . What is the next case? Can we dispose of these ladies now?

"Mr. Goldschein [Special United States Attorney]: Mrs. Jane Rogers.

"The Court: Is she here?

"Mr. Goldschein: She is here, yes, sir. Now, may it please Your Honor—

"The Court: Step over here, madam. What is the status of her case?

"Mr. Goldschein: Mrs. Rogers refuses to answer the questions propounded to her in the grand jury room. She was brought back on yesterday, but says that she will answer one question but will not answer any others, and was advised that it would be necessary for her to answer all questions propounded except those which would incriminate her for the violation of a federal offense, and she says she won't answer any.

"The Court: Is that your position, madam?

"Mr. Menin [counsel for petitioner]: I think there has been a misunderstanding.

---

[12] For a description of the abuses which led to the incorporation of the privilege against self-incrimination in the Bill of Rights, see Pittman, The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America, 21 Va. L. Rev. 763.

382

"The Court: Just a minute. Will you please be seated, Mr. Menin? Please be seated.

"Mr. Menin: Well, I represent this lady.

"The Court: Just a moment. Please be seated.

"Mr. Menin: Very well.

"The Court: I'll hear you in due course[.] Madam, do you still persist in not answering these questions?

"Mrs. Rogers: Well, on the basis of Mr. Menin's statements this morning—

"The Court: Will you please answer the question yes or no?

"Mrs. Rogers: Well, I think that's rather undemocratic[.] I'm a very honest person. Would you mind letting me consider—

"The Court: Make any statement you wish.

"Mrs. Rogers: Well, as I said before, I'm a very honest person and I'm not acquainted with the tricks of legal procedure, but I understand from the reading of these cases this morning that I am—and I do have a right to refuse to answer these questions, on the basis that they would tend to incriminate me, and you read it yourself, that I have a right to decide that.

"The Court: You have not the right to say.

"Mrs. Rogers: According to what you read, I do. I stand on that.

"The Court: All right. If you will make no changes, it is the judgment and sentence of the court you be confined to the custody of the Attorney General for four months. Call the next case." Transcript of Record, pp. 76–78 (September 23, 1948).