Carl Harvey JACKINS, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 14748.

United States Court of Appeals
Ninth Circuit.

March 8, 1956.

Arthur G. Barnett, Seattle, Wash., for appellant.

Charles P. Moriarty, U. S. Atty., Richard D. Harris, Asst. U. S. Atty., Seattle, Wash., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellant was indicted upon ten counts charging him with refusing to answer questions propounded to him at a hearing of a subcommittee of the Committee on Un-American Activities of the House of Representatives in violation of Title 2 U.S.C.A. § 192.[1] He waived a jury and upon trial by the court was found guilty upon five of the ten counts. He was sentenced to a term of six months upon each count, the sentences to be concurrent, and to pay a fine of $250. The imprisonment sentences were suspended and the defendant-appellant was placed on probation.

The hearing out of which these charges arose was held at Seattle, Washington, in the month of June, 1954. The indictment listed in the separate counts questions which Jackins refused to answer. The numbers of the counts and the questions listed in each count, with the verdict on each, appear in the margin.[2]

■■ The appeal, insofar as it relates to the finding of guilty on counts 2, 8 and 10 of the indictment, may be quickly disposed of. Since the decision in the court below, the Supreme Court in Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964; Emspak v. United States, 349 U.S. 190, 75 S.Ct. 687, 99 L.Ed. 997, and Bart v. United States, 349 U.S. 219, 75 S.Ct. 712, 99 L.Ed. 1016, has held that where a witness before such a committee objects to answering a certain question, asserting his privilege against self-incrimination, the committee must overrule his objection based upon the Fifth Amendment

[1] "§ 192. Refusal of witness to testify or produce papers. Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months. As amended June 22, 1938, c. 594, 52 Stat. 942."

[2] Count I. Will you tell the committee please, briefly, what your employment record has been since 1935. Guilty.

Count II. How were you employed in 1948. Guilty.

Count III. Did you hold an official position in 1948 or at any time prior thereto, in Local 46 of the International Brotherhood of Electrical Workers. Not Guilty.

Count IV. Were you expelled from Local 46 of the International Brotherhood of Electrical Workers in 1948. Not Guilty.

Count V. Were you also expelled as business agent of the Building Service Employees' Union sometime prior to 1948. Not Guilty.

Count VI. Were you at any time expelled from Lodge 751 of the Aero Mechanics Union. Not Guilty.

Count VII. Is this (work of personal counseling) something originated by the Communist Party as part of its program. Not Guilty.

Count VIII. Who are the other people, then, when you used the word "we" that are associated with you in this movement. Guilty.

Count IX. But what is the name of the group. Guilty.

Count X. Does the group that you referred to have an office with you in the same office that you work in. Guilty.

and expressly direct him to answer before a foundation may be laid for a finding of criminal intent to violate § 192. Said the Court, Quinn v. United States, supra, 349 U.S. at page 166, 75 S.Ct. at page 675: "In short, unless the witness is clearly apprised that the committee demands his answer notwithstanding his objections, there can be no conviction under § 192 for refusal to answer that question." There was no compliance here with this requirement of a direction to answer following the refusal of Jackins to answer the questions specified in counts 2, 8 or 10.[3] It follows that conviction upon those counts cannot be sustained.

■ The question listed in count 1 was "Will you tell the Committee please, briefly, what your employment record has been since 1935." In refusing to answer that question, as in the case of all the other questions here involved, Jackins invoked his privilege against self-incrimination under the Fifth Amendment. Jackins was entitled to that privilege if this particular question was "asked in a setting of possible incrimination," Emspak v. United States, supra, 349 U.S. at page 199, 75 S.Ct. at page 693. There is no doubt that the setting in which this question was asked was such as fully to justify Jackins' claim of privilege.

At the same hearing of the subcommittee at which these questions were asked of Jackins, other witnesses claiming to be former Communists had named him as having been a "full time functionary" within the Communist Party, identifying him as a "youth leader" and as an organizer of the University branch of the Party. They had testified that he had been expelled from certain labor unions because he was a Communist Party member. It appears from the record also that about 1948, an Un-

American Activities Committee of the Washington State legislature, known as the Canwell Committee, had received testimony identifying Jackins as a member of the Communist Party. The various witnesses, both before this subcommittee and before the Canwell Committee, had listed Jackins along with other alleged Communists, some of whom had been prosecuted under the Smith Act, 18 U.S.C.A. § 2385.

It is clear that when this question was asked Jackins he was put on notice that he also might be prosecuted under the Smith Act. As stated in Blau v. United States, 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170, the provisions of that Act made future prosecution of Jackins "far more than 'a mere imaginary possibility'". And, as suggested by the other testimony before the Committee, in such a prosecution it might well be a part of the Government's case that Jackins had been occupied during the periods mentioned in these other witnesses' testimony, namely from 1936 on, as a youth leader or organizer or other "full time functionary" within the Party in and about the City of Seattle. A part of the Government case in the Smith Act prosecution would have been the proof of how he was employed since 1935. Since an answer to this question "would have furnished a link in the chain of evidence needed in a prosecution" within the meaning of the Blau case, supra, it seems perfectly clear that Jackins properly claimed the privilege with respect to the question specified in count 1.

To understand the setting in which the question listed in count 9 was asked requires further explanation of the course of the examination as it proceeded before the subcommittee. This question was: "But what is the name of the group"?[4] It came near the end of the

---

3. In the Specification of Errors, the appellant specified error in his conviction on counts 2 and 8 "for failure of the committee to direct the appellant to answer the question." Although the specification did not refer to the question list-

ed in count 10, we notice the matter as a plain error under Criminal Rule 52(b), 18 U.S.C.A.

4. In answering a previous question as to the work in which Jackins was presently engaged, he had used the words "a

committee's examination of Jackins. Following his refusal to answer the question as to his employment record since 1935, he also refused on the same ground to state how he was employed in 1948. To the question as to how he was now employed he replied that he was employed as a personal counsellor; that this he had done since approximately 1950 or 1951. He declined to answer questions as to whether he had held positions in certain labor unions in 1948. He declined to answer any question as to membership in the Communist Party. He declined to answer questions as to whether he had been expelled from certain labor unions. He declined to answer any question as to the truth or falsity of testimony of previous witnesses before the committee who had identified him as an active member of the Communist Party.

The committee's counsel then announced that he had no further questions to ask the witness, and the same thing was indicated by other members of the Committee, whereupon Congressman Clardy took up the questioning. Referring to the witness' present occupation of "personal counseling" he inquired what that meant and thereupon Jackins gave an extended answer as to the type of work in which he was presently engaged. He said he was acting as an adviser to persons who were suffering emotional distress.[5] Following that answer the Congressman inquired: "What do you mean by 'we'? Is this something originated by the Communist Party as part of its program?"[6] Jackins refused to answer invoking the same Fifth Amendment privilege. After he had been directed and again refused to answer this question the Congressman asked the question listed in count 8 as follows: "Who are the other people, then, when you use that word 'we' that are associated with you in this movement?" The witness declined to answer for the same reason previously stated. The Congressman then inquired, "Very well, are those that you associate with the persons that have been identified in this proceeding as members of the Communist Party?" This also Jackins declined to answer, and he declined to answer a final question of this Congressman as to the names of the persons with whom he was associated in this activity. Then Congressman Doyle followed with the question which contained the portions specified in count 9. This was: "I have two questions. You are the one that volunteered that your present occupation was working with a group, and in my book that is a waiver of your privilege under the Fifth Amendment. But what is the name of the group?" What we must now determine is wheth-

group of us" who had become interested in emotional problems of individuals. The question referred to the "group" thus mentioned.

5. This answer was: "I am working with a very new approach to the problem of individual human beings. We have discovered, a group of us, that apparently anything wrong with an individual human—any limitation on his ability, his enjoyment of life, his ability to be intelligent in any situation—is purely and solely the result of the experiences of hurt which he has endured, including emotional distress, quite as important as experiences of physical pain; that anything less than rational or able about an individual human being can be traced as the literal expression of experiences when he has been hurt, beginning very early and accumulating, and that it is possible in a teamwork relationship for one person's intelligence as a counselor to be linked with that of the person who is enduring the difficulty or the limitation or the emotional problem—to go back in memory, in effect and, by repetitively seeking out these experiences of hurt, discharging the stored up painful emotion; and in assisting the person to think them through over and over and over again, it is possible to free an individual from the inhibiting effects of the distresses, which have stored up on him during his life. Now this is a very exciting field; the possibilities implicit in it—and we are pioneering in the group with which I work—are amazing."

6. This was the question specified in count 7. See footnote 2, supra.

er Jackins' refusal to answer that question was within the privilege that he claimed.

The Government contends first that the question was a perfectly harmless one and that under the circumstances the witness could have no reasonable cause to apprehend danger from a direct answer thereto. In the second place, the Government argues, when Jackins described at length the work in which he was engaged, he waived any right to refuse to answer questions that might thereafter be propounded to him with respect to that occupation or the group to which he there referred; in short, that the answer set forth in footnote 5, supra, constituted a waiver.

■ It is apparent that the Government's contention fails to take note of the fact that immediately following the fairly long explanation of his occupation, the whole setting in which the further questions were made was completely changed by those which followed. The first one of these was "What do you mean by 'we'? Is this something originated by the Communist Party as part of its program?" The next one was "Are those that you associate with the persons that have been identified in this proceeding as members of the Communist Party?" Finally came the assertion of Mr. Doyle in the first part of the question here involved. "You are the one that volunteered that your present occupation was working with a group, and in my book that is a waiver of your privilege under the Fifth Amendment." It is clear that by these statements on behalf of the Committee Jackins was forthwith put on notice or given reason to fear that the committee or the Government proposed to delve into the question whether or not the enterprise in which Jackins said he was employed was a branch of the Communist Party and that he was working therein with other members of the Party. Certain it is that this long answer with respect to his occupation did not constitute a waiver for the answer was in no sense or manner incriminating; it contained no admission of guilt; it furnished no proof of crime and so could not be a waiver for the reasons made clear in Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138, and McCarthy v. Arndstein, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023.[7] When Jackins thereafter heard the committees' suggestion that the group which had been mentioned in his answer was a Communist group he had reasonable cause to fear a further identification of that group might be used against him in a Smith Act prosecution. As stated by Chief Justice Marshall in United States v. Burr, 25 Fed.Cas. pages 38, 40, No. 14,692(e), "What testimony may be possessed, or is attainable, against any individual the court can never know." Nor could Jackins know what testimony was available to prove that this so-called group was, as the Congressman suggested, a part of the Communist Party program. It would be a part of the Government's case then to prove what the group was and to identify it by name, and if Jackins had himself given the name of the group that would be a further link in the chain of evidence against him. The assertion by Congressman Doyle that he had already waived his rights constituted additional cause for the witness reasonably to fear further answers.

■ When a witness called before a committee or other hearing body, is told by his interrogators that he is suspected of wrongdoing, or of association with wrongdoers, those accusations are a part of the setting in which must be judged

7. At page 359 of 262 U.S., at page 563 of 43 S.Ct. "And since we find that none of the answers which had been voluntarily given by Arndstein, either by way of denials or partial disclosures, amounted to an admission or showing of guilt, we are of opinion that he was entitled to decline to answer further questions when so to do might tend to incriminate him." The decision was reaffirmed at 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158. Also in accord, see United States v. Costello, 2 Cir., 198 F.2d 200, 203.

**410**

his right to claim the privilege against self-incrimination. This is abundantly clear from the decisions. In Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 818, 95 L.Ed. 1118, the prosecutor before the grand jury was attempting to draw from the witness information as to his contacts and connection with one Weisberg who was alluded to as a fugitive witness. It also appeared from a supplemental record upon which the court relied that the grand jury had been told by the court that its investigation was to cover " 'the gamut of all crimes covered by Federal statute' " and the witness had been publicly charged with being a known underworld character and a racketeer with a 20 year police record including a sentence on a narcotic charge. While he was waiting to testify the witness was photographed with the head of the local office of the United States Bureau of Narcotics. Under these circumstances said the Supreme Court "[p]etitioner could reasonably have sensed the peril of prosecution for federal offenses ranging from obstruction to conspiracy."

In Aiuppa v. United States, 6 Cir., 201 F.2d 287, 299, a hearing was had before a special committee of the United States Senate authorized to study and investigate organized crime. When the witness was called to testify numerous investigators of government departments including the Bureau of Internal Revenue, Bureau of Narcotics, Department of Justice, Alcohol Tax Unit and Federal Bureau of Investigation, were in attendance. While the witness was on the stand the counsel for the Committee was called to say something about the witness and it was said that Aiuppa was considered a close associate of other well known criminals and also associated with manufacturers of gambling equipment. Holding that "The assertions of the committee attorney already quoted indicate his fixed purpose to incriminate appellant by his own admissions and to connect him with the criminal activities

of the notorious Anthony Accardo", the court reversed the judgments of conviction and ordered the release of Aiuppa. The court in that case relied upon a number of similar cases from other circuits. The Aiuppa case, and most of those other cases, are cited with apparent approval in a footnote in the Emspak case, supra, 349 U.S. at page 201, 75 S.Ct. 694. The Emspak case, in describing the setting in which the questions there involved were asked, referred to the publication in newspapers prior to the witness' appearance of a story that the Department of Justice was about to take steps toward his criminal prosecution in connection with a non-Communist affidavit filed with the National Labor Relations Board.

■ All of these cases demonstrate that the action of the committee members in indicating through their questions the apparent purpose to prove the group referred to by Jackins to be a part of the Communist Party or composed of Communist members justified the witness in fearing that the furnishing of the name of the group as called for by the question in count 9 would tend to incriminate him.

■ As stated in Hoffman v. United States, supra, "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." As that case held, Jackins' claim of privilege must be sustained since in the setting here described "it was not 'perfectly clear, from a careful consideration of all the circumstances in the case, that the witness [was] mistaken, and that the answer(s) cannot possibly have such tendency' to incriminate." 341 U.S. 486-487-488, 71 S.Ct. 819.

The judgment is reversed with directions to enter a judgment of acquittal upon all counts.