**Marcus SINGER, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 13299.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 20, 1956.

Decided April 18, 1957.

Judgment Vacated June 28, 1957.

Edgerton, Chief Judge, dissented.

Mr. Daniel H. Pollitt, Washington, D. C., with whom Messrs. Sidney S. Sachs, Joseph L. Rauh, Jr., and Lewis Jacobs, Washington, D. C., were on the brief, for appellant.

Mr. Harold D. Rhynedance, Jr., Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Lewis Carroll, William Hitz and John D. Lane, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN and WILBUR K. MILLER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

In May, 1953, the Congressional Committee on Un-American Activities was investigating, through a subcommittee, the activities of Communists in the field of education. Marcus Singer, called as a witness, testified freely that some years before, when he was on the teaching staff of Harvard University, he had been a member of a Communist Party group and had frequently attended its meetings. But he repeatedly refused to answer when asked about others with whom he had associated in that activity, basing his refusal on honor, conscience and fear of self-incrimination. The subcommittee rejected his reliance on the Fifth Amendment and directed him to answer. He continued to refuse.

The House of Representatives adopted a resolution[1] directing that his contumacy be certified to the United States Attorney for presentation to the grand jury. As a result Singer was indicted in 22 counts for refusing, in violation of 2 U.S.C. § 192,[2] to answer as many questions propounded to him by the subcommittee. We are concerned here only with Count 11, under which Singer was convicted, fined $100.00, and given a suspended jail sentence of three months, from which conviction he appeals. This count was based on his refusal to answer the following question:

"Now, these people we have mentioned up to this time—Robert G. Davis, Wendell H. Furry, Isador Amdur, Norman Levinson, John H. Reynolds, Dirk Struik, William Ted Martin, Lawrence Arguimbau, and Helen Deane Markham—did they attend these meetings to which you testified yesterday?"

The principal reason for reversal urged by the appellant is that the District Court erred in rejecting his reliance on the Fifth Amendment as justifying his refusal to answer. He suggests that an affirmative answer to the question in Count 11 would have subjected him to real danger of prosecution under the Smith Act, 54 Stat. 671 (1940), 62 Stat. 808 (1948), 18 U.S.C. § 2385. The pertinent portion of this statute is:

"Whoever organizes or helps or attempts to organize any society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence; or becomes or is a member of, or affiliates with, any such society, group, or assembly of persons, knowing the purposes thereof—

"Shall be fined not more than $10,-000 or imprisoned not more than ten years, or both, and shall be ineligible for employment by the United States or any department or agency thereof, for the five years next following his conviction."

Singer's previous disclosures to the subcommittee, briefly noted above, will be more fully summarized. The Communist Party group with which he met fairly regularly when he was teaching at Harvard University numbered 14 or 15 at the most, with seven or eight usually present at the meetings. The group was not disciplined as to attendance. Its members discussed Marxian philosophy, believed in its application, and attempted to apply it to present-day events. Singer considered himself a Communist, had supported the Communist program, and had contributed money to the *Daily Worker* and the Communist Party. He agreed that, from a long range viewpoint, Communism is a conspiracy to overthrow the government, but said that he himself did not conspire with anybody, and that he and the other members of his group did nothing subversive. The person who solicited him to join the group was on the staff at Harvard and those who attended its meetings were associated in some capacity with Harvard or Massachusetts Institute of Technology.

Whether this testimony, freely given by the appellant to the subcommittee, was in itself incriminatory, we need not decide. For if it was, an answer to the Count 11 question would not have increased the danger of prosecution under the Smith Act, as we shall show. On

---

1. H.R.Res. No. 538, 83d Cong., 2d Sess. (1954).

2. Section 192 is as follows:
"Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100, and imprisonment in a common jail for not less than one month nor more than twelve months." § 192.

the other hand, if the freely-made disclosures were not incriminating, an affirmative answer to the critical question could not have made them so, as will appear. The result is the same in either event.

We consider the first alternative: that Singer's testimony already given concerning his Communist Party group had stamped it as a "society, group, or assembly of persons who teach, advocate, or encourage the overthrow or destruction of any such government by force or violence" within the meaning of the Smith Act. If his testimony had that effect, Singer had incriminated himself before he was asked the Count 11 question, for he had also said he had affiliated with the group and knew its purposes. He told the subcommittee flatly that he considered himself a Communist. He thus indubitably identified himself with the Communist cause. An admission that certain named persons, no matter who they were, attended the meetings could not have added to the self-incrimination which was already complete.

We turn to the second alternative: that Singer's testimony already freely given concerning his Communist Party group did not identify it as a "society, group, or assembly" of the sort described in the Smith Act. He insists it was not such an organization but was an innocent assembly of intellectuals; and that his disclosures to the subcommittee were therefore not incriminatory under the Smith Act. But he argues he might have incriminated himself by an affirmative answer to the Count 11 question because the nine persons about whom he was asked were what he terms "hardcorps [3] [*sic*]" Communists, and one of them was then under indictment for conspiring to forcibly and violently overthrow the government of the Commonwealth of Massachusetts.

This implies, we suppose, that appellant regarded himself and some of his colleagues in his Communist Party group as "soft-core" Communists, or innocent scholars, and feared that the mere presence of "hard-core" Communists at their meetings might make all those in attendance subject to prosecution under the Smith Act. Perhaps he was particularly fearful that the presence of the one hard-core Communist who had been accused of having hostile designs on Massachusetts might taint the whole group.

Such fears were unfounded. Singer said, "We were not subversive. * * * We were intellectuals. We were scholars." This meant, of course, that the meetings of Singer's Communist Party group were innocent gatherings, no matter who was present. For the effect of his testimony is that, if any of the hard-core nine attended any of the meetings, they did not intrude any radical view or proposal such as advocacy of unlawful action. The mere silent presence of the hard-core nine at the gatherings of the innocent intellectuals could not transform the entire assemblage into a group which advocated overthrow of government by force or violence.

Moreover, it does not appear that the nine persons named in Count 11 constituted a "society, group, or assembly" of the sort described in the statute, or that they constitued a group at all. Nor does it appear that the hard-core nine "had the purposes the Smith Act condemns." They seem to have been nine individuals who happened to have the common denominator of hard-core Communism. To be sure, one of the nine had been indicted for conspiring against Massachusetts; but an indictment is not evidence. It follows that Singer's admission that meetings of his Communist Party group were attended by some or all of the nine persons mentioned in Count 11—meetings at which nothing subversive was done—would not have stamped the group itself as one in which membership is unlawful.

It is suggested that in a prosecution under the Smith Act the Government might be able to convince a jury that

---

**3.** Probably written inadvertently for "hard-core." The term is not defined.

Singer's Communist Party group was not what he said it was but actually advocated overthrow of government by force. Of course that is possible, if the Government could unearth evidence not shown or suggested in the record before us. Singer subjected himself to the danger of that possibility by his voluntary disclosure that he had been a member of the group.

But the question is not whether the Government might conceivably be able to prove, by evidence now unknown, that Singer's group itself actually was subversive. Rather, the question is, would Singer have subjected himself to increased danger of prosecution by admitting the nine hard-core Communists had attended meetings of his soft-core group? The answer must be in the negative because, as we have said, the silent presence at the meetings of some hard-core Communists would not have stamped the whole group as a society, group, or assembly of the sort described and denounced in the Smith Act. Even the silent presence of the one hard-core individual who had been accused of conspiring against Massachusetts could not have that effect.

It cannot be that Singer, having identified himself as a member of the Communist Party group, could properly refuse to say whether other named Communists attended its meetings, simply because it is conceivable that later the Government might somehow obtain evidence showing the whole group was in fact subversive. If that were true, any witness before the Un-American Activities Committee could refuse to answer any question merely because he might in the future be convicted of a Smith Act violation on evidence quite unrelated to the question asked.

The case before us is closely analogous to the case of Rogers v. United States, 1951, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344, where the Supreme Court held that, having testified she had been treasurer of the Communist Party in Denver, the witness was not protected by the Fifth Amendment in refusing to give the name of her successor to whom she turned over the Party papers. Said the Court, "[D]isclosure of acquaintance with her successor presents no more than a 'mere imaginary possibility' of increasing the danger of prosecution." 340 U.S. at pages 374–375, 71 S.Ct. at page 443. So it is here. Singer's Fifth Amendment plea was properly rejected by the District Court. The other points he makes on appeal do not require discussion.

Affirmed.

EDGERTON, Chief Judge (dissenting).

Appellant, having waived a jury, was convicted by a District Judge of refusing to answer a question asked by a subcommittee of the House of Representatives Committee on Un-American Activities. 52 Stat. 942, 2 U.S.C.A. § 192. At a Committee hearing in 1956, appellant testified he was not then a Communist but that when he was at Harvard in 1940 or 1941, and until perhaps 1944 or 1945, he had considered himself a Communist and had "supported the Communist program" because he "was interested in it" and "believed in it". He said he had "met with a Communist Party group" which was engaged in study and discussion of Marxism and which "did nothing subversive". He denied having supported any program that involved violence. He said: "we were not subversive * * *. We didn't follow any slavish policy. We were intellectuals. We were scholars. * * * We were autonomous."

He refused, on grounds both of "honor and conscience" and of the Fifth Amendment, to answer several of the Committee's questions regarding other persons. He was indicted on several counts. He was convicted only on Count 11, which charged him with refusing to say whether nine named persons, all but one of whom he acknowledged that he knew, attended the meetings he attended. The court ruled that his refusal to answer that question was not privileged, because, in the court's opinion, an an-

swer would not have subjected him to "any real danger of further incrimination".

I think the court erred. The privilege against self-incrimination protects a refusal to answer unless it is "*perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer * * * *cannot possibly* have such tendency' to incriminate." Hoffman v. United States, 341 U.S. 479, 488, 71 S. Ct. 814, 819, 95 L.Ed. 1118 (Italics in original). For two distinct reasons, it is by no means "perfectly clear" that an answer to the question could not "possibly" have a "tendency to incriminate".

1. If appellant had answered in the affirmative, he would thereby have contributed directly to a "link in the chain of evidence needed in a prosecution * * * for violation of * * * the Smith Act." Blau v. United States, 340 U.S. 159, 161, 71 S.Ct. 223, 224, 95 L.Ed. 170. The Smith Act makes it unlawful to be a member of a "society, group, or assembly of persons" who advocate overthrow of the government of the United States, or the government of any State, by force or violence, "knowing the purposes thereof". 54 Stat. 671, 62 Stat. 808, 18 U.S.C. § 2385. To convict a man under this section of the Act, the government would have to convince a jury (1) that there had been such a society, group, or assembly of persons, (2) that the defendant had been a member of it, and (3) that he had known its illegal purposes.

Testimony before the Committee had some tendency to show that the nine persons named in Count 11 had the purposes the Smith Act condemns. Five of the nine had testified that they had been Communist Party members. All nine had been publicly identified before the Committee as Communist Party members. One of the nine, Davis, had testified in effect that the members of the group to which Davis belonged were under strict Party control and were not mere rank-and-file Party members: "All the members used aliases on their cards, and the party membership of his group was kept secret from the rank-and-file members of the Communist Party * * * under instructions from the Communist Party." There was testimony that one of the nine persons named in Count 11 had been treasurer of the Harvard branch of the Party. One of the nine was actually under indictment for conspiring to advocate overthrow of the government of Massachusetts by force.

The fact that all this testimony was insufficient to convict anyone of anything is immaterial. Although Communist Party members, even if they are under strict Party control, and even if they are more than rank-and-file members, and even if they are under indictment, may have no purpose of overthrowing the government by force, the existence of a popular belief that they are much more likely than most people to have such a purpose is too notorious to be questioned or ignored. The premise that they may be innocent, and may never be prosecuted, is sound. But it does not support the conclusion that they are no more likely than ordinary people, or even ordinary "students of Marxism", to be prosecuted under the Smith Act.

The Smith Act term "society, group, or assembly of persons" is broad. It is not a term of art. It implies no more about the "persons" than that they repeatedly meet. If the nine persons named in Count 11 repeatedly met, they were members of a "society, group, or assembly of persons", and their membership had some tendency to show that the group had the purposes the Smith Act condemns. If appellant attended the meetings of such a "society, group, or assembly of persons", he also was a member of it. An affirmative answer to the question in Count 11 would therefore have tended to show both (1) that there had been the sort of group the Smith

Act condemns and (2) that the appellant had been a member of it.

At the trial, the prosecutor said: "of course, it is going to incriminate Mr. Singer to admit that Struick, Amdur, and the rest were in his party. We don't say that is not incriminatory. We say that he cannot avail himself of the silence with respect to it. Of course, he is going to be worse off. He is going to be far worse off. I concede that." This concession was fair and appropriate. No testimony the appellant had given was so incriminating as an affirmative answer to the question in Count 11 would have been. The Internal Security Act of 1950 provides that "Neither the holding of office nor membership in any Communist organization by any person shall constitute per se a violation * * * of this section or of any other criminal statute." 64 Stat. 992, 50 U.S.C.A. § 783(f). The appellant had not said, but an affirmative answer to the question in Count 11 would have said, that he had belonged to a group containing numerous Communists who were under strict Party control and were more than mere rank-and-file Party members, a group that contained an officer of a Communist organization, a group that even contained a person who was afterwards indicted for attempting to overthrow a government by force. The appellant testified that his group was autonomous.[1] He testified he did not know Davis. He testified in effect that his group was simply one of the "Marxist study groups" which, according to Davis, were conducted by Communist Party "instructors". On this appeal the parties have stipulated that at appellant's trial, "Davis said one of the functions of his group was to conduct Marxist study groups. He said 'It was fairly easy to form them because at this time * * * there was lively interest in Marxism; and though I think persons joining these groups had some idea that the instructors were close to the Communist Party they, nevertheless,

were ready to discuss Marxism with them, and in some cases actually the persons whom the party secured were not actually party members but were intellectual social scientists who knew a good deal about Marxism and were willing to discuss it before a group.' "

It does not matter whether the testimony the appellant had given is or is not regarded as having some incriminating tendency. Giving testimony that has some incriminating tendency does not obligate a witness to give other testimony that will subject him to a " 'real danger' of further crimination." Rogers v. United States, 340 U.S. 367, 374, 71 S.Ct. 438, 95 L.Ed. 344. Arndstein v. McCarthy, 254 U.S. 71, 41 S.Ct. 26, 65 L.Ed. 138; McCarthy v. Arndstein, 262 U.S. 355, 43 S.Ct. 562, 67 L.Ed. 1023; United States v. Courtney, 2 Cir., 1956, 236 F.2d 921; Jackins v. United States, 9 Cir., 1956, 231 F.2d 405; Starkovich v. United States, 9 Cir., 1956, 231 F.2d 411. Our District Court has applied this principle in other cases. United States v. Nelson, D.C.1952, 103 F.Supp. 215; United States v. Hoag, D.C.1956, 142 F. Supp. 667.

2. The privilege against self-incrimination is not confined to testimony which tends directly to establish a fact the government would have to prove in a possible criminal prosecution of the witness. The privilege extends to testimony that might be used "to search out other testimony to be used in evidence against him * * * in a criminal proceeding * * *." It extends to testimony that might lead to "the obtaining and the use of witnesses and evidence * * * on which he might be convicted * * *." This is what the Supreme Court expressly held in Counselman v. Hitchcock, 142 U.S. 547, 564, 12 S.Ct. 195, 35 L.Ed. 1110. It seems to me clear that Counselman v. Hitchcock covers this case and requires us to reverse the present conviction. I know of no argument to the contrary.

1. Though he accepted the prosecutor's suggestion that he "met with a Com-munist Party group", he immediately asked to explain the nature of the group.

If the appellant had told the Committee that the persons named in Count 11 attended the meetings he attended, it might have enabled the government to "search out" from them, and also concerning them, evidence that could be used against him. It might have led to "the obtaining and the use of witnesses and evidence * * * on which he might be convicted * * *" either (1) of violating the Smith Act, or (2) of perjury in the testimony he had previously given the Committee. It would certainly have tended to validate any testimony against him which any of the persons named in Count 11 might give. Though the appellant had attributed an innocent character to his group, it did not follow that the government would not be able, in a prosecution under the Smith Act, to convince a jury that his group was not what he said it was but actually advocated overthrow of the government by force.[2] It did not follow that the government would not be able, in a prosecution for perjury, to convince a jury that he had given the Committee testimony which was false and which he knew to be false.

The prosecutor recognized the fact that if the appellant had said the persons named in Count 11 attended the meetings he attended, it might have enabled the government to get from them evidence that would incriminate him. The prosecutor recognized the importance of this fact. In arguing a motion preliminary to appellant's trial, he said: "the committee surely had the right to inquire into whether or not he was telling the committee the truth when he made [his] denial of subversion, and in doing so to find who was there who would either refute it or affirm it."

I do not imply that I think appellant's other contentions unsound.

---

**2.** Similarly, in a Smith Act prosecution the jury might not have before it, or might disbelieve in view of other testimony, the statements Singer made to the Committee regarding the year when he ceased

his Communist activities. Accordingly the Statute of Limitations has nothing to do with this case. The government does not suggest otherwise.