**In re GRAND JURY INVESTIGATION.**

United States District Court,
E. D. Pennsylvania.

Feb. 15, 1979.

John F. Brown, Jr., Criminal Div., Dept. of Justice, Washington, D. C., for government.

Raymond J. Quaglia, Philadelphia, Pa., for witness.

## OPINION

POLLAK, District Judge.

One week ago, February 8, 1979, a witness declined to answer certain questions put to her by Government counsel before a Grand Jury. That afternoon, Government counsel, the witness, and counsel for the witness appeared in chambers. There ensued an extended argument on whether the questions put to the witness were ones she was obligated to answer, or whether, as she insists, the answers may tend to incriminate her so that she is shielded from responding by the Fifth Amendment. Following that argument in chambers, the Government submitted a proposed order, seeking to compel the witness to answer twenty-four questions when, later today, she is recalled before the Grand Jury. (The questions are attached hereto as Appendix A.)

According to representations made by the Government, the matter under investigation by the Grand Jury relates to a federally sponsored program involving the administration of an experimental medication at a Philadelphia hospital. The Government thinks there is good reason to believe—and is asking the Grand Jury to explore the likelihood that—a physician at the hospital has falsified reports submitted to a federal agency in violation of 18 U.S.C. § 1001 and 21 U.S.C. § 333. Specifically, the Government asserts that documents submitted by the physician to the Food and Drug Administration show systematic administration of the experimental medication, while records prepared by the hospital nursing staff for internal hospital use show virtually no administration of the medication.

The witness is a nurse employed at the hospital. The Government seems to believe that within the scope of the witness's duties at the hospital she has some responsibility in connection with the experimental medication program. As will be seen by referring to the list of questions set forth as Appendix A, counsel for the Government wish to ask the witness a number of questions dealing with (1) her training and work experience, (2) the general range of routine duties relating to the administration of medications at the hospital, and (3) the procedures attendant on the administration of experimental medications at the hospital.

The Government argues that no question proposed to be put to the witness would incriminate her. It contends that the only culpable activity under inquiry is the physician's possible falsification of reports and that "it is illogical to assume a doctor who intends to falsify FDA forms to reflect the administering of a study drug, would divulge that information to a third party who is not essential to the commission of the fraud."

On this record, the Government's application poses the problem addressed by Judge Hastie in *United States v. Coffey*, 198 F.2d 438 (3d Cir. 1952): "what to do about apparently innocuous questions, the answers to which are admittedly not incriminating in themselves, when there are no additional facts before the Court which suggest particular connecting links through which the answer might lead to and might result in incrimination of the witness." Judge Hastie resolved the problem this way:

It is enough (1) that the trial court be shown by argument how conceivably a prosecutor, building on the seemingly harmless answer, might proceed step by step to link the witness with some crime against the United States, and (2) that this suggested course and scheme of link-

age not seem incredible in the circumstances of the particular case. *Id.* at 440. (Footnote omitted)

Accord: *American Cyanamid Company v. Sharff*, 309 F.2d 790 (3d Cir. 1962).

A physician who sought to gull FDA into supposing that medication was being administered pursuant to a research program when the physician in fact intended to divert the medication to a clandestine purchaser in an illicit market would, of course, face criminal liability. Cf. *United States v. Reiff*, 435 F.2d 257 (7th Cir. 1970). It hardly seems "incredible," to use Judge Hastie's word, that a physician might find it prudent to enlist a nurse's collaboration in such an enterprise and that a nurse might be induced to lend such assistance. Their collaboration might take many forms, some aspects of which might involve wholly and indeed systematically innocent conformity with internal hospital routines. Thus, it is not "perfectly clear . . . that the witness is mistaken and that the answer[s] cannot possibly have such tendency to incriminate." *Hoffman v. United States*, 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118 (1951).

■ Accordingly, the Government's application will be denied to the extent that it seeks information connecting the witness with the administration of experimental medications. In particular, the witness will not be required to answer question # 11 and questions # 16 to # 24. The other questions, which seek to elicit information concerning her training, her work experience, and the manner in which non-experimental medications are administered, do not seem to pose a real and appreciable danger of criminal prosecution.*

■ One final point bears emphasis. Counsel for the witness, relying on *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), has argued that his client will be held to have waived her Fifth Amendment privilege if she answers any questions whatsoever. This argument misconceives the *Rogers* decision, which merely restated the longstanding rule that where incriminating facts have been voluntarily revealed, the privilege cannot be invoked to avoid disclosure of the details. See *McCormick, Evidence* (2d ed. 1972) § 140. In any event, if the witness answers some questions under court order, she clearly has not voluntarily waived her right to refuse to answer others.

### APPENDIX "A"

### PROPOSED QUESTIONS BEFORE GRAND JURY

1. How long have you been a nurse?

2. Where were you trained?

3. What type of training did you receive?

4. What were you instructed as regards the recording of administered medication?

5. When did you work at [the] hospital [where you are now employed]?

6. What unit did you work in?

7. What shift did you work?

8. What was the procedure with regard to the administration of drugs at [the] hospital [where you are now employed]?

9. Who would order medication for a patient?

10. Would the order be written or oral?

11. Were you assigned the care of specific patients during their stay at the hospital?

12. Who would order medication for a patient in need if the attending physician was not present?

13. Would the nurse always administer medication for the doctor?

14. Would all medication administered be recorded?

15. Would all doctor's orders for medication be written on the green treatment sheet for each patient?

16. Were there different procedures in regard to the use of experimental drugs?

---

* In asking questions 8–10, and 12–15, the Government should preface each question with the phrase "As to non-experimental medications . . . ."

17.  How were they administered?

18.  How were they recorded?

19.  Would experimental drugs be given to patients other than those who were patients of the doctor running the study?

20.  What types of questions would you ask patients in order to evaluate the effectiveness of an experimental drug?

21.  If an experimental drug was being given would other medication be given at the same time?

22.  Where are drugs stored at the hospital?

23.  Are experimental drugs stored in the same place?

24.  Who selected patients for participation in an experimental drug study?